# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 15-515

**STATE OF LOUISIANA**

**VERSUS**

**BARRY ROY**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 173084
HONORABLE MARK A. JEANSONNE, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**JOHN E. CONERY**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and John E. Conery, Judges.

**AFFIRMED.**

**Charles A. Riddle, III**
**District Attorney**
**Norris Joseph Greenhouse**
**Assistant District Attorney**
**12th Judicial District Court**
**417 North Main Street**
**Marksville, Louisiana 71351**
**(318) 253-6394**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Peggy J. Sullivan**
**Louisiana Appellate Project**
**Post Office Box 2806**
**Monroe, Louisiana 71207**
**(318) 855-6038**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Barry Roy**

**CONERY, Judge.**

Defendant, Barry Roy, was charged by grand jury indictment with two counts of molestation of a juvenile while the juveniles were under his supervision and control, violations of La.R.S. 14:81.2. The victim of the first count was C.A.,[1] and the victim of the second count was A.B. C.A. and A.B. were both under the age of seventeen at the time of the offenses. Defendant entered pleas of not guilty to both counts. Thereafter, Defendant was tried by a jury and found guilty of both counts.

The State filed a habitual offender bill against Defendant charging Defendant as a second habitual offender. Defendant entered a plea of not guilty to the charge. Defendant filed a "Motion for New Trial for Newly Discovered Evidence." Subsequently, Defendant was adjudicated a second habitual offender on both counts of molestation of a juvenile.

The trial court denied Defendant's motion for new trial and sentenced Defendant as a habitual offender to ten years at hard labor on each count, to run consecutively. Defendant filed a "Motion to Reconsider Sentence Imposed Pursuant to the Habitual Offender Law, La.R.S. 15:529.1," which the trial court denied that same date. Defendant filed a pro se "Motion for New Trial," and his attorney filed a motion to reconsider sentence. The trial court held a hearing and again denied the motion to reconsider sentence filed by Defendant's counsel and the pro se motion for new trial filed by Defendant.

Defendant then filed a "Notice of Appeal and Motion to Substitute Counsel," which the trial court granted that same date. Now before this court are

---

[1] The victims' initials are used here to protect their identity pursuant to La.R.S. 46:1844(W).

two separate appeals. Record number 15-515 is the appeal of Defendant's conviction for two counts of molestation of a juvenile (lower court #173084). Record number 15-516 is the appeal of Defendant's habitual offender adjudication and sentences (lower court #181963-A).

In his appeal of his conviction in 15-515, Defendant challenges the sufficiency of the evidence as to both of the convictions for molestation of a juvenile. For the following reasons, we affirm.

## FACTS

Both victims testified that in 2011 and 2012, Defendant, DOB May 30, 1975, had sexual intercourse with them. Further, during that time, Defendant was the live-in boyfriend of the victims' mother. C.A. and A.B. were both under the age of seventeen during that time period.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there are no errors patent.

## ASSIGNMENT OF ERROR

On appeal, Defendant challenges the sufficiency of the evidence as to his convictions for two counts of molestation of a juvenile. The jury convicted Defendant of committing molestation of A.B. and C.A. when Defendant had control or supervision over them. The crime of molestation of a juvenile, La.R.S. 14:81.2, provides in pertinent part:

> A. (1) Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual

2

desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile's age shall not be a defense.

In particular, Defendant asserts that the State failed to elicit information from the mother of A.B. and C.A. as to whether Defendant exercised supervision or control over the victims. Further, Defendant asserts that the victims fabricated the allegations.

The State asserts that Defendant moved into the victims' home, pretended to be the father they did not have, and took advantage of two teenage girls in a dysfunctional home. The State further asserts, "Barry Roy preyed upon the ongoing conflict between [the mother] and her daughters; and masterfully turned that home into a sexual haven for himself, using two (2) teenagers to quench his sexual appetite."

This court has stated the following regarding the standard for reviewing a claim of insufficiency of the evidence to support a conviction:

> The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger,* 05–11, p. 91 (La.7/10/06), 936 So.2d 108, 170, *cert. denied,* 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007) (citing *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville,* 448 So.2d 676, 678 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford,* 05–477, p. 6 (La.2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson,* 96–1048 (La.10/4/96), 680 So.2d 1165; *State v. Lubrano,* 563 So.2d 847, 850 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith,* 94–3116 (La.10/16/95), 661 So.2d 442.

> The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan,* 07–504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268.

Thus, other than ensuring the sufficiency evaluation standard of *Jackson,* "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert,* 97–64, pp. 4–5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726–27). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown,* 558 U.S. [120], [134], 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother,* 09–2357, pp. 10–11 (La.10/22/10), 49 So.3d 372, 378 (alteration in original).

*State v. Francis*, 12-1221, pp. 6-7 (La.App. 3 Cir. 4/3/13), 111 So.3d 529, 533, *writ denied*, 13-1253 (La. 11/8/13), 125 So.3d 449.

The first witness to testify for the State was A.B., the victim of count two. A.B. testified that her date of birth is May 2, 1997, and she was sixteen at the time of trial. A.B. testified that her mom's boyfriend, Defendant, lived with them in Simmesport. A.B. identified Defendant in court. When asked how old she was when Defendant first came to live with them, A.B. testified that she thought she

4

was in the seventh grade and thirteen years old.  A.B. described the first incident

involving her and Defendant as follows:

> A.      In my mom's house, I was in her room.  I came home and I mean we, we had we had [sic] sexual intercourse.  I mean . . .
>
> Q.      Okay.  Do you recall what lead up to the sexual intercourse the first time?
>
> A.      I mean we was I was I was [sic] to my mom's house to you know being a regular kid digging in my mom's jewelry box and I was digging in her stuff and he was sitting on mama's bed playing a game.  So, I sat on the bed.  I was checking a message in my phone and he I mean he looked at me and like I am cute.  And he kissed me on my cheek and from my cheek he went from my cheek to my lips.  And we just had sexual intercourse.
>
> Q.      When he kissed you on your cheek, did you attempt to stop him?
>
> A.      No.
>
> Q.      When you kissed him when he kissed you on the lips did you attempt to stop him?
>
> A.      No, sir.
>
> Q.      And when you say y'all had intercourse, can you explain to me what happened and to the Court and to the Jury what happened?
>
> A.      We I mean I let him get on top of me I mean I let him get on top.  He it [sic] was I laid back and . . .
>
> Q.      Did any part of his body enter into any part of your body?
>
> A.      Yes.
>
> Q.      What part?
>
> A.      His, his private entered his private [sic] entered my private.  His private entered my vagina.

When asked how long after Defendant moved into the house did this first

event occur, A.B. replied, "Not really long because I wasn't staying at home."

A.B. explained that she was staying with her cousin and had gone home to get

clothes.  A.B. testified that she and Defendant talked about the fact that she was abusing her mom.  When asked if she was under the impression that Defendant was counseling her or discussing things with her as a father figure, A.B. replied:

> A.    At first, I thought at first I looked at him as that.  I thought he was the type of person you know that is going that is going [sic] to treat us as a father.  That is going to teach us right from wrong.
>
> Q.    Okay.  When did that change?
>
> A.    When I went to my mama's house and we had sex.

Again, when asked how her relationship with Defendant changed from looking at him as a father figure, A.B. replied:

> A.    When I had sex with him.
>
> Q.    How did you view your relationship with him then?
>
> A.    At first, I looked at him like as a he is like a bad person.  But then as it started happening more and more, I started catching feelings for him.
>
> Q.    Okay.  And when you say catching feelings.  Tell us please?
>
> A.    I started like I fell in love with him.

Later in her testimony, A.B. described a time when Defendant spoke with her like a step-father:

> A.    [H]e would tell us this ain't right.  You shouldn't hit your mom. He was talking to us as a step-father.  That's when he went from that and he lead on to stuff other things [sic].

A.B. further testified that Defendant put his mouth on her private part, and invited her to do the same to him.  A.B. refused, however, because Defendant had many sexual partners.

A.B. testified that although Defendant bought all of her siblings presents, he would buy special things for A.B.  According to A.B., she and Defendant made plans to start their own life when she turned eighteen.  When A.B. turned eighteen,

6

Defendant would be forty. At one point, A.B. and Defendant thought A.B. might be pregnant. When asked about Defendant's relationship with C.A., A.B. testified that before she got "locked up," she, Defendant, and C.A. had a joint sexual encounter.

At the time of trial, A.B. was incarcerated at Ware Youth Center because of charges stemming from fights with her mom. During one of her mom's visits, A.B.'s mom asked A.B. about a letter she found documenting a conversation between A.B. and Defendant. A.B. told her mom that A.B. and Defendant had been messing around. Finally, A.B. testified that she was not making up the allegations.

On cross-examination, A.B. testified that she takes medication for mood disorders and depression. When asked if Defendant was a father figure to her, A.B. replied:

> A. Some ways he was. Some ways he wasn't. But probably at first when I first met, I looked at him like he was a good person. I mean cause I was (UNINTELLIGIBLE) oh, he a good man you know cause just when they all come in they just like they a good man. So, when they came in when he came in I thought he was a good man. But what's been happening it started as I felt all right it was from him being a good man to him being an abuser. Then it went from that to him being I had caught feelings for him.

A.B. further testified that Defendant abused her and left bruises on her.

C.A., the victim of count one, also testified for the State. C.A. identified Defendant in court and testified that he lived with her and her family in Simmesport. C.A. was fifteen when Defendant began living with them. When asked if A.B. was living at the home at that time, C.A. explained that A.B. was living with her mother but was staying at her cousin's home.

When asked how she viewed Defendant before anything occurred between them, C.A. replied:

A.    He was nice.  He was a gentlemen [sic] when I first met him.

Q.    Okay.  Would he do things with ya'll?

A.    Yes, sir.

Q.    Okay.  Did you consider did you look upon as your step-father at that time?

A.    Yes, I did.

Q.    Did something happen to change your outlook of him as a step-father?

    . . . .

A.    When he started messing around with me and my sister and it just changed from there.

The first time C.A. and Defendant were together was during the joint sexual encounter with A.B.  When asked what happened that first time, C.A. stated that both sexual and oral intercourse occurred between Defendant and A.B. and between Defendant and C.A.  C.A. testified that Defendant's penis came into contact with her body.  C.A. testified that she was fifteen.  According to C.A., she saw Defendant having vaginal sexual intercourse with A.B. and that A.B. was in a position to see C.A. as well.  Besides the threesome with Defendant and A.B., C.A. testified that she and Defendant had sexual relations about a dozen other times.

C.A. testified that another one of her mom's boyfriends made sexual advances toward her.  When C.A. told her mom, her mom did nothing.  C.A. was angry with her mother and hurt by her failure to do anything.

When asked when she stopped regarding Defendant as a "step-father relationship," C.A. replied, "It was when all of [sic] when the incident occurred."

According to C.A., the sexual relations with Defendant occurred within a two-year period. C.A. testified that she reported the incidents when she heard that her sister had reported them.

On cross-examination, C.A. was asked whether she told someone that Defendant did not force her to have sex with him and that she only did so to get back at her mom. C.A. responded:

> A.     That never came that statement never came out of my mouth. It was brought to my attention and I told them that it was stated that my sister would get back at my mother. It never came out of my mouth that I was going to get back at my mother as revenge.

C.A. further testified that she initially denied the allegations because she had made a pact with her sister not to say anything.

C.A. testified that she has ADHD and a personality disorder. At the time of trial, she was taking Aderoil (sic), BAZA4, and Risperdal. On re-direct, C.A. testified that she was seventeen when the abuse stopped and that she was eighteen when she reported it.

The sole defense witness to testify was Lashontray Anderson, the mother of the two victims. Defendant was Ms. Anderson's boyfriend, whom she dated for a "year or two." According to Ms. Anderson, her relationship with Defendant ended before the sexual allegations were made. When asked if she believed her daughters were telling the truth about the allegations, Ms. Anderson replied, "Yes now I do after they told me everything."

On cross-examination, Ms. Anderson was asked if she ever caught her daughters and Defendant in the bedroom "in a weird kind of way." Ms. Anderson described a time when she walked into the bedroom and saw Defendant standing in

front of C.A. while C.A. sat on the bed. Ms. Anderson asked the two what was going on, and they both said nothing was going on.

After hearing the above evidence, the jury found Defendant guilty of molestation of both A.B. and C.A. The jury also found that Defendant committed the molestation of both A.B. and C.A. when he had control or supervision over both of them.

As previously stated, Defendant asserts two arguments in support of his claim that the evidence was insufficient to convict him of the molestation of both A.B. and C.A. First, Defendant argues that the State failed to elicit any information from Ms. Anderson, the mother of the victims, as to whether Defendant exercised supervision and control over the victims. The only evidence as to Defendant's supervision and control, Defendant contends, was the testimony of A.B. and C.A. that they initially thought Defendant was a nice man, that they looked to him as a father figure, and that they discussed with Defendant their relationship with their mother.

We find there was sufficient evidence that Defendant committed the molestation of the victims while the victims were under his supervision and control. The jurisprudence has interpreted the "supervision and control" element of molestation of a juvenile to be satisfied by someone who has emotional control over the victim, as well as by someone who is a live-in boyfriend, non-custodial parent, babysitter, relative, friend, a pastor, and neighbor. *See State v. Anderson*, 10-779 (La.App. 5 Cir. 3/27/12), 91 So.3d 1080; *State v. Davis*, 47,599 (La.App. 2 Cir. 1/16/13), 108 So.3d 833, *writ denied*, 13-381 (La. 9/20/13), 123 So.3d 163 (citing *State v. Ellis*, 38,740 (La.App. 2 Cir. 8/18/04), 880 So.2d 214)); *State v. Goss*, 46,193 (La.App. 2 Cir. 5/18/11), 70 So.3d 6.

In *Anderson,* the defendant was the victim's school bus driver until the victim graduated in the eighth grade. When the victim was fourteen, she began to have more contact with the defendant, with whom she shared a mutual interest in music. The defendant would pay visits to the victim's classroom and leave notes in her locker. The victim's parents allowed the victim to accompany the defendant to a recording studio so she could play the piano for a song the defendant wrote. Instead of taking the victim straight home, the defendant stopped by his home to show the victim his band room and waterbed. The defendant kissed the victim while at his home. During the drive to the victim's house, the defendant told the victim that there were going to have an "adult relationship" that, if exposed, would cause his six-year-old daughter to become homeless. The victim's relationship with the defendant continued to escalate, and the two began having sex. The relationship continued until just after the victim turned sixteen. In response to Anderson's argument that the State failed to prove he exercised control or supervision over the victim, the fifth circuit stated:

> In this case, L.L.P. testified that she and the defendant engaged in digital penetration, oral sex, and penile/vaginal intercourse while they were alone in his home. The defendant asked for and received permission from D.P. to drive L.L.P. to the recording studio where he was recording music. The defendant drove L.L.P. to his home in Marrero. The defendant subsequently had L.L.P. cut her window screen for the purpose of picking her up in the middle of the night. The defendant provided L.L.P. with alcohol and pornography when he was the only adult present.
>
> In addition, the defendant exercised a significant level of emotional control over L.L.P. The defendant was in a position of trust and authority relative to L.L.P. The defendant told L.L.P. that if she revealed the nature of their relationship to anyone, he would have to go to jail and his daughter would be homeless. Accordingly, we find that the State demonstrated that the defendant had "control or supervision" over L.L.P.

*Id.* at 1086 (citation omitted).

11

In *Davis*, the second circuit upheld Davis' convictions of three counts of molestation of a juvenile. The court found the element of supervision or control was satisfied as to one of the victims when Davis was the victim's uncle, lived with the victim, and was alone with the victim during one of the incidents. As to the other two victims, the element of supervision or control was satisfied by the fact that Davis was their mom's live-in boyfriend and was the father of their youngest sibling. *See also State v. Kennon*, 34,445, 34,456 (La.App. 2 Cir. 2/28/01), 781 So.2d 734, where the court found that Kennon, the live-in boyfriend of the victim's mother, had control and supervision of the thirteen-year old victim while the victim's mother was away at work.

In this case, Defendant was the live-in boyfriend of the victims' mother and was significantly older than the victims. At trial, A.B. testified that she believed she was in the seventh grade (age thirteen) when Defendant came to live with them. A.B. also testified that she and Defendant talked about the fact that when she turned eighteen he would be forty. C.A. testified that she was fifteen when Defendant began living with them, and Defendant was thirty-five.

In addition, the sexual incidents occurred at the home while Defendant was living there. Even though A.B. was staying with her cousin when the first sexual incident occurred, A.B. was at her mom's house "being a regular kid digging in [her] mom's jewelry box" while her mom was at work. Defendant was the only adult in the house during the first sexual incident between Defendant and A.B. According to C.A., her mother was sleeping when the sexual molestation to her occurred. Defendant acted as a father-figure in the house. Both A.B. and C.A. testified that before the first sexual incident occurred, they looked to Defendant as a father figure. A.B. testified that at times, Defendant spoke to them as a step-

12

father, telling them that they should treat their mom better. A.B. also testified that although Defendant would buy her extra things, he would buy for all of her brothers and sisters when her mom was around, giving the appearance that Defendant assumed a "father-like" role to all of the siblings. Finally, Defendant exerted emotional control over A.B. by leading her to believe that they would start a life together when she turned eighteen.

Although there was no testimony that Defendant babysat or took care of the victims, there was evidence that Defendant lived in the home with the victims, acted as a father figure towards the victims, and exercised emotional control over the victims. Therefore, we find the evidence was sufficient to support the jury's finding that Defendant sexually molested the victims by the use of influence by virtue of a position of supervision or control over them in violation of the provisions of La.R.S. 14:81.2.

In addition to claiming that he did not have supervision and control of the victims, Defendant also challenges the sufficiency of the evidence claiming that the victims fabricated the allegations. As this court has stated:

> It is well-settled that a victim's testimony alone is sufficient to support a verdict as long as that testimony was believed by the trier of fact and that testimony does not contain internal contradictions or irreconcilable conflicts with physical evidence:
>
>> A victim's or witness's testimony alone is usually sufficient to support the verdict, as appellate courts will not second-guess the credibility determinations of the fact finder beyond the constitutional standard of sufficiency. *State v. Davis*, 02-1043, p. 3 (La. 6/27/03); 848 So.2d 557, 559. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the fact finder, is sufficient support for a requisite factual conclusion. *State v. Robinson*, 02-1869, p. 16 (La. 4/14/04); 874 So.2d 66, 79.

*State v. Dorsey*, 10-216, pp. 43-44 (La. 9/7/11), 74 So.3d 603, 634, *cert. denied*, ___U.S. ___, 132 S.Ct. 1859, 182 L.Ed.2d 658 (2012).

*State v. Bergeron*, 14-608, p. 16 (La.App. 3 Cir. 11/5/14), 150 So.3d 523, 534 (footnote omitted). The jury in the present case heard both of the victims testify as to the sexual conduct between each of them and Defendant. Thus, the jury was able to evaluate the victims' testimonies and obviously chose to believe the victims. Defendant failed to prove any internal contradictions in the victims' testimonies or irreconcilable conflicts between the victims' testimonies and physical evidence.

For the foregoing reasons, we find Defendant's second assignment of error lacks merit.

## DISPOSITION

For the foregoing reasons, we affirm Defendant's convictions on both counts of molestation of a juvenile while the juveniles were in his supervision and control, violations of La.R.S. 14:81.2. Defendant's convictions are affirmed. We discuss Defendant's appeal relative to his habitual offender conviction in docket number 15-516.

**AFFIRMED.**

14