# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 15-1131


**STATE OF LOUISIANA**

**VERSUS**

**DARRELL KENNEDY MALLETTE**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT
PARISH OF SABINE, NO. 72168
HONORABLE STEPHEN BRUCE BEASLEY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## DAVID KENT SAVOIE
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, John E. Conery, and David Kent Savoie, Judges.


**VACATED, RENDERED IN PART, AND REMANDED.**


**COOKS, J. concurs in the result only.**

**Honorable Don M. Burkett**
**District Attorney**
**P. O. Box 1557**
**Many, LA 71449**
**(318) 256-6246**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **State of Louisiana**

**Anna L. Garcie**
**Assistant District Attorney**
**P. O. Box 1557**
**Many, LA 71449**
**(318) 256-6246**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **State of Louisiana**

**Christopher Hatch**
**The Hatch Law Firm, LLC**
**624 Stoner Avenue**
**Shreveport, LA 71101**
**(318) 425-3965**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Darrell Kennedy Mallette**

**SAVOIE, Judge.**

The Defendant, Darrell Kennedy Mallette, was charged by indictment filed on May 7, 2013, with aggravated rape, a violation of La.R.S. 14:42. Defendant entered a plea of not guilty on June 27, 2013. On March 11, 2014, Defendant waived his right to trial by jury. A written motion followed on July 31, 2014. A bench trial commenced on July 31, 2014. On August 1, 2014, the trial court found Defendant guilty of molestation of a juvenile under the age of thirteen, a violation of La.R.S. 14:81.2.

On August 8, 2014, Defendant filed a motion for post-verdict judgment of acquittal and a motion for new trial. A hearing on the motions was held on August 21, 2014, and the matters were taken under advisement. On August 29, 2014, the trial court denied the motion for post-verdict judgment of acquittal but granted the motion for new trial. The State filed a motion to reconsider the granting of the motion for new trial on September 4, 2014, which was denied on September 15, 2014.[1] On September 24, 2014, Judge Stephen Beasley, who had presided over Defendant's trial and had granted the motion for new trial, recused himself from the matter.

---

[1] In its motion, the State asserted the following:

> On the afternoon of Friday, August 1, 2014, the Trial Court contacted the defendant's attorney, Richard Woolbert, and the Assistant District Attorney, Anna L. Garcie, and informed them that he had contacted a State's witness, Paula Phaup, telephonically and during their conversation they discussed the trial. The Trial Court then stated that he called Paula Phaup a second time to elicit additional information and now had concerns regarding what he believed were inconsistencies in the case. He thereafter told the defendant's attorney and the Assistant District Attorney to do with the information as they saw fit.

The State further noted the trial court reconsidered Defendant's bail upon its own motion. Thereafter, defense counsel filed a motion for new trial. At the hearing on the motion, the trial judge stated he would not consider anything outside the scope of the evidence presented at trial.

The State filed a writ application with this court on October 24, 2014, seeking review of the trial court's granting of Defendant's motion for new trial. This court granted the State's writ application, reversed the grant of the motion for new trial and reinstated the trial court's judgment of guilty of molestation of a juvenile under the age of thirteen, citing *State v. Guillory*, 10-1231 (La. 10/8/10), 45 So.3d 612.[2] *See State v. Mallette*, 14-1123 (La.App. 3 Cir. 12/4/14) (unpublished opinion), *writ denied*, 15-39 (La. 4/2/15), 164 So.3d 814.

On December 9, 2014, Retired Justice Edward Bleich was assigned ad hoc to hear and dispose of this case. Justice Bleich sentenced Defendant on July 15, 2015, to serve ninety years at hard labor, with at least twenty-five years to be served without benefit of probation, parole, or suspension of sentence. The trial court ordered Defendant to pay costs of court, which included damages incurred by the victim, and to serve an additional six months in prison in default of payment. The trial court further ordered Defendant's truck seized, impounded, and sold at public sale. Defendant filed a motion to reconsider the sentence on July 28, 2015, which was denied on August 17, 2015.

A motion and order for appeal and designation of record was filed on September 14, 2015. The motion was granted on October 5, 2015.

Defendant is now before this court asserting that the evidence is insufficient to support his conviction and his sentence is excessive. For the following reasons, we vacate Defendant's conviction and sentence for molestation of a juvenile under

---

[2] In *State v. Guillory*, the supreme court stated that when a trial court grants a new trial but "fails to identify the concerns it had with the trial, we find the decision to grant a new trial was an error of law because there is nothing to support the exercise of the of the trial court's discretion." *Id.* at 617.

2

the age of thirteen, enter a judgment of guilty of indecent behavior with a juvenile, and remand the matter for sentencing.

## FACTS

The Defendant was convicted of molestation of a juvenile under the age of thirteen for acts committed against his step-granddaughter E.H.[3]

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there are three errors patent that render Defendant's sentence for molestation of a juvenile illegal; however, these errors are moot due to our finding that Defendant's conviction and sentence be vacated, a conviction of guilty of indecent behavior with a juvenile entered, and the case remanded for sentencing.[4]

---

[3] The victim's initials are used in accordance with La.R.S. 46:1844(W).

[4] First, the court imposed "at least" twenty-five years of Defendant's ninety-year sentence to be served without the benefit of parole, probation, or suspension of sentence. However, in cases where the trial court imposes "at least" a number of years without benefits, this court has found the sentence indeterminate, vacated the sentence, and remanded for resentencing. *See State v. Fruge*, 09-1131 (La.App. 3 Cir. 4/7/10), 34 So.3d 422, *writ denied*, 10-1054 (La. 11/24/10), 50 So.3d 828, *State v. Cedars*, 02-861 (La.App. 3 Cir. 12/11/02), 832 So.2d 1191, *State v. Burton*, 94-486 (La.App. 3 Cir. 11/9/94), 649 So.2d 694, and *State v. Frank*, 93-1402 (La.App. 3 Cir. 4/6/94), 635 So.2d 634.

In addition, the trial court ordered Defendant to pay the costs of court and indicated that court costs "shall include such damages incurred by the victim." While the trial court is not required to specify the amount of court costs, its failure to set an amount of restitution results in an indeterminate sentence. *See State v. Karam*, 02-163 (La.App. 3 Cir. 7/31/02), 834 So.2d 1003 and *State v. Joseph*, 05-186 (La.App. 3 Cir. 11/2/05), 916 So.2d 378. Moreover, we are not aware of any authority for imposing damages as a part of court costs. If the trial court was imposing restitution, it erred in failing to set the amount of restitution. *See* La.Code Crim.P. arts. 887 and 883.2.

The trial court also erred in imposing default time on a defendant who is presumed indigent. At sentencing, the court ordered Defendant to pay court costs and in default thereof, to serve an additional six months in prison. Defendant was represented by appointed counsel at trial and is represented by appointed counsel on appeal. This court has found this to be presumptive evidence of a defendant's indigence requiring deletion of the default time portion of the sentence. *See State v. Holloway*, 10-74 (La.App. 3 Cir. 10/6/10), 47 So.3d 56.

3

In his first assignment of error, Defendant contends the evidence adduced at trial was insufficient to support his conviction for molestation of a juvenile.

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See Graffagnino*, 436 So.2d at 563, *citing State v. Richardson*, 425 So.2d 1228 (La.1983). To obtain a conviction, the elements of the crime must be proven beyond a reasonable doubt.

*State v. Freeman*, 01-997, pp. 2-3 (La.App. 3 Cir. 12/12/01), 801 So.2d 578, 580.

> Furthermore, the testimony of a single witness is sufficient to support a conviction "[i]n the absence of internal contradiction or irreconcilable conflicts with physical evidence." *State v. Dixon*, 04-1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936. The trier of fact may accept or reject the testimony of any witness, and the determination of the credibility of that witness, in whole or in part, is left to its sound discretion and "will not be re-weighed on appeal." *Id.* at 936.

*State v. F.B.A.*, 07-1526, pp. 1-2 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, 1009, *writ denied*, 08-1464 (La. 3/27/09), 5 So.3d 138.

Lora Cain, an employee of the Department of Child and Family Services (DCFS), testified that she received a complaint on February 25, 2013, alleging neglect due to the mother's lack of adequate supervision over E.H. and E.H.'s siblings, and sexual abuse of E.H. by her grandfather, the defendant. A Child

Advocacy Center interview was arranged at Project Celebration in Many, a forensic examination of E.H. was arranged at the Care Center in Shreveport, and law enforcement was notified. Other members of E.H.'s home were interviewed, and Ms. Cain determined that, at the time of "the report," E.H., her mother, a younger sibling, and an older sibling lived together.

Ms. Cain was asked if E.H.'s mother, Samantha Schoubroek, made an allegation of improper behavior by the defendant, and Ms. Cain stated:

> [Ms. Schoubroek] stated that at one time, uh, that, uh, [E.H.] had made statements, uh, that, uh, when she was ten or eleven years old, Ms. Schoubroek said that [E.H.] had made statements to an aunt who then turned around and told Ms. Samantha Schoubroek. Ms. Schoubroek stated that she asked [E.H.] what happened and that [E.H.] had told her the first time it happened was when Mr. Mallette had taken her [J.] [sic] to the water park. I believe Ms. Schoubroek, uh, well I know she took [E.H.] to the doctor and they said that everything was fine. Uh, she said that [E.H.] didn't [sic] her if it was fondling or not, that just it was that one time.

Ms. Cain read from the portion of the physical examination report that she had prepared as follows: "[E.H.] made allegations her step grandfather, Kenny Mallette, raped her. Said it happened more than once with [the] last incident over a year ago. Child had no contact with step grandfather [sic]." This information was gleaned by Ms. Cain from E.H.'s forensic interview. However, E.H. did not use the word "rape" during the forensic interview.

Dr. Jennifer Olsen Rodriguez was recognized as a pediatrician with expertise in child abuse and neglect. Dr. Rodriguez was employed at the Care Center on April 3, 2013. The abuse reported to Dr. Rodriguez was alleged to have occurred at least two years before her evaluation of E.H.

The examination of E.H. revealed that her hymen and anus were normal. However, Dr. Rodriguez testified that a normal exam neither proved nor disproved

sexual abuse. Prior to conducting an examination, Dr. Rodriguez knew the abuse was alleged to have occurred from the time E.H. was six until she was twelve years old. Dr. Rodriguez was further questioned as follows:

Q     If a six year old was abused sexually with penetration, would you expect to see internal injuries from that if an adult male, a full grown male, did something like that, fully penetrated her?

A     Majority of exams are normal. I have seen children who have tears but most exams in child abuse, sexual abuse, are normal exams or nonspecific.

Q     So again, this is a general question and I'm not trying to be vulgar. If a full grown adult male has full sexual intercourse with a six year old, there's not any permanent damage done?

A     There can be. There was a study done with repetitive penile penetration where they looked at children and had them rank if there was penetration. It's the one study where they actually discussed penile vaginal penetration and in that study only eighty-seven percent of the children evaluated or eighty-seven percent had normal or nonspecific exams. Only thirteen percent had evidence of penetrative trauma.

Q     What is considered to be evidence of penetrative trauma?

A     That is when-- so you have your labia, you have this space, you have the hymen, you have the vagina. So there's penetration. It begins through the labia then it has to go in that space area, get to the hymen and then to cause injury it has to go past the hymen so there's an area of penetration that you're not to the hymen yet. Then when you go past the--

Q     I'm sorry to interrupt you. About how lengthwise about how much is that on a normal child of this age?

A     It would be-- it could be around an inch-- centimeters to an inch.

        . . . .

A     There is actually a space. So to have an injury you have to go past the hymen. And when we say definitive evidence, it means either when a child is seen-- if they're seen within the first few days, you have a fresh tear or injury on the hymen or the labia where it's fresh and you see it and it's the few days after because they heal quite quickly. And then when they're not seen acutely or right away, weeks

or months or years later, what you would see is a missing section of hymen. We call it a cleft when there is just a small missing section or larger section. So that's what we call definitive evidence.

Q      Did you see such a cleft in your patient?

A      No.

Paula Phaup testified that she taught E.H.'s older brother at Zwolle Elementary School and had met E.H. there.  E.H. was in kindergarten or first grade at that time.  Two years prior to trial, Ms. Phaup joined the same church as E.H. She began working with the church youth, and, during that time, would pick up children in the church's van and bring them to church services.  E.H. was one of those children.

After three or four months of transporting E.H. to church, E.H. told Ms. Phaup that she had been molested by the Defendant.  At the time this conversation occurred, E.H.'s grandmother was living in the home with E.H. However, Defendant had moved. Ms. Phaup described E.H.'s demeanor as "[b]roken, very broken, crying, uh, angry, sad."  When asked why she had not reported the incidents, E.H. told Ms. Phaup that Defendant was the only source of income in the home, and "as long as he was raping her, he was leaving the other kids alone." When asked if other family members were aware of Defendant's actions, Ms. Phaup stated that E.H.'s aunt had figured it out.  E.H. was thirteen years old at the time she told Ms. Phaup what happened to her.  The family discovered the issue about a year before.  Ms. Phaup testified that E.H. said her mother asked her if she wanted to call the police, and E.H. said "no," because she was scared. Approximately three months after the report, Ms. Phaup told the school nurse about E.H.

7

A few days after Ms. Phaup reported the behavior, she received a call from E.H.'s mother, who was upset because she picked up the children for church. E.H.'s mother stated E.H. would no longer be attending church. Ms. Phaup called Detective Jason Rivers, a police officer, to meet her at the home because the mother was screaming and cursing her. When asked if she observed any interaction between E.H. and her mother when E.H. was dropped off, Ms. Phaup stated, "it was more than once I heard her say look at what you've caused to happen, uh, you're going to end up putting four people in jail." Ms. Phaup testified that E.H. never recanted her story.

E.H. once used Ms. Phaup's phone to call Defendant. E.H. told him she forgave and loved him. Defendant called back to tell E.H. happy birthday, but E.H. was not with Ms. Phaup at that time.

Detective Rivers was employed by the Sabine Parish Sheriff's Department on February 26, 2013. On that date, his office received a call from DCFS regarding E.H. Detective Rivers interviewed Ms. Phaup and then made arrangements with E.H.'s mother for E.H. to be brought to Project Celebration. He observed the interview of E.H., and subsequently interviewed E.H.'s mother.

E.H.'s mother, Ms. Schoubroek, was interviewed on February 27, 2013. Ms. Schoubroek informed Detective Rivers and Ms. Cain that, when E.H. was ten years old, E.H. told her aunt about Defendant's behavior. Ms. Schoubroek stated E.H. never mentioned it to her, as she never left her children alone with Defendant. E.H. told her of one incident when Defendant took E.H. and her brother to the park. As a result, Ms. Schoubroek called Defendant. Ms. Schoubroek subsequently took E.H. to the doctor. Ms. Schoubroek stated that she wanted to report the matter to police, but her mother and E.H. did not want her to.

Ms. Schoubroek stated that Defendant was in town for one Christmas. However, he did not live in the house at the time. The house was located near a school, and she, her children, and her mother resided there. On that occasion, E.H. slept with Ms. Schoubroek.

Ms. Schoubroek testified E.H. said Defendant fondled her, and when asked when and where, E.H. said she did not know. She further stated that when E.H. was asked when and where it happened, "she couldn't give us no answers." Ms. Schoubroek told her mother about the matter, and also confronted Defendant, who denied anything occurred. Ms. Schoubroek's mother threatened to kill Defendant, and the two were to be divorced. When Ms. Schoubroek confronted Defendant, she said the following occurred:

> I understand and I respect you and he said that I would never do nothing to harm you or your children. And if you want me to stay away from your kids, I will stay away. And that was it. He never said anything else or done anything. He calls every now and then to make sure that I have what I need. If I need something, he said that, you know, he'd do his best to help to get it. He still helps my mother every now and then and he doesn't, you know, he doesn't come around us but he does call and check.

Ms. Schoubroek also indicated that she knew nothing about Defendant giving her mother $500.00 a month.

Detective Rivers also interviewed Debbie Thompson, who is E.H.'s aunt, on February 28, 2013. Ms. Thompson said that, while E.H. was visiting her residence, she asked E.H. if "somebody had messed with [her]." E.H. then stated that Defendant had. Ms. Thompson then related the event as follows:

> And I said well, what did he do, baby. She said well, he patted me on my butt and he shouldn't have touched me there. I said he do anything else and she said no, he just patted me on my butt. And I said you're a kid and y'all were out swimming. He's going to pat you on your butt to try to get you to swim.

Ms. Thompson called E.H.'s mother. E.H. then said "he didn't really do it." Ms. Thompson said E.H. was "just mad at him because he wouldn't let her go on the truck." When Detective Rivers indicated that E.H. said she had given more information to Ms. Thompson, Ms. Thompson said E.H. was a habitual liar. Ms. Thompson later stated that E.H. "tells you one thing and then changes the story to another thing."

Ms. Thompson said she knew nothing about Defendant paying his wife $500.00 a month not to report the matter to police, but knew Defendant gave her money "every now and then." Ms. Thompson then stated Defendant helped out when there was not enough money to pay bills.

Detective Rivers next interviewed Wanda Mallette, E.H.'s grandmother and Defendant's wife. Ms. Mallette was married to Defendant and could not afford a divorce. Ms. Mallette stated that almost three years prior to her interview, E.H. "told my sister that he'd [Defendant] patted her on the butt." Thereafter, Ms. Mallette questioned E.H. about the incident and, according to Ms. Mallette, E.H. told her that

> [W]hen they were swimming pawpaw touched her on her butt where he wasn't supposed to. She had a swimming suit on, wasn't supposed - - but he picks them up and he throws them out in the water and goofing off. I don't believe it but she said that he touched her on her butt more than one.

Ms. Mallette removed Defendant from her home, although Defendant denied molesting E.H. when asked by Ms. Mallette. Ms. Mallette then stated, "the more that I know my granddaughter and her little lies, I don't believe it."

Ms. Mallette was with Defendant seventeen or nineteen years, but testified she no longer had anything to do with him. She indicated she last saw Defendant at Christmas and that E.H. was at church during that time. Defendant also brought

E.H. a birthday cake, but she was at church at that time as well. Ms. Mallette indicated that if E.H. said she saw Defendant on her birthday, she had lied. She denied walking in on Defendant molesting E.H. Ms. Mallette also denied blackmailing Defendant. She stated she called him the "day before yesterday" and asked for fifty dollars. She had also called Defendant on January 1st for a loan to pay her rent, and Defendant wired money to her.

Ms. Mallette did not believe Defendant touched E.H. and stated that E.H. was "messing with" little boys in the neighborhood and that "[s]he's messed with - - in church." Ms. Mallette said that Ms. Paula, a church member, had caught E.H. kissing a girl.

Detective Rivers interviewed Defendant on March 1, 2013. Defendant indicated he was legally married to Ms. Mallette, but that Ms. Mallette wanted a divorce two years ago, and he did not know why. Defendant and Ms. Mallette had gone before a notary to sign paperwork indicating that they were divorcing. Defendant stated he gave Ms. Mallette $200.00 a week because he felt sorry for her as she had no other source of income. Ms. Mallette drew the money from the bank on a card Defendant gave her. He denied Ms. Mallette was blackmailing him. He testified Ms. Mallette had only $400.00 a month income. Defendant also stated he took groceries to the grandkids. Defendant said he gave Ms. Schoubroek his car, a 1991 GEO Metro, because she had a wreck. He then stated that he and Ms. Schoubroek were friends. When Defendant and Ms. Mallette separated two years ago, Ms. Schoubroek was living next door to them. Defendant said that he also sent $50.00 a week to his son who was attending college in New Mexico.

Defendant admitted swimming with E.H. but denied touching her inappropriately. He also denied that Ms. Mallette told him he had to leave. When

asked if he penetrated E.H. vaginally and anally, the Defendant indicated he had not.

Defendant said he saw E.H. at Christmas in Ringgold at Shelby's house. He also stated that E.H.'s birthday was on December 10, and he brought her a cake for her birthday and saw her that day.

Defendant stated E.H. would lie but not very often. He further stated that E.H. told him that her uncle, Johnny Thompson, had "messed with her."

Detective Rivers testified that Defendant mailed his bank records to Rivers. The records were marked as State's Exhibit 7. He confirmed that money received by Ms. Mallette was drawn from Defendant's bank account by her.

Detective Rivers obtained medical records from pediatrician Dr. Husan Sukerek, the person to whom Ms. Schoubroek took E.H. after the initial report of abuse. There were no records showing the visit described by Ms. Schoubroek, and Dr. Sukerek informed Detective Rivers that the office did not examine children for sexual activity. Rivers testified that E.H. was tested for STDs on July 5, 2012, but was not checked for penetration.

Detective Rivers stated E.H.'s initial allegations were that Defendant had touched her behind and then changed to include vaginal and anal penetration. Detective Rivers testified that Ms. Schoubroek, Ms. Thompson, and Ms. Mallette spoke about Defendant touching E.H. on her behind, but that E.H. did not state such in her interview. All statements were consistent with something happening to E.H. two years before the report.

Shelly Cartinez testified that she worked as a nurse practitioner for Dr. Sukerek, a pediatrician. E.H. was treated for routine illnesses from 2009 to 2010. E.H. was seen on July 5, 2012, for a well visit. Ms. Schoubroek did not mention

sexual abuse at that time. However, it was reported that E.H. was experiencing vaginal discharge. During the visit, E.H. denied being sexually active. Ms. Cartinez asked Ms. Schoubroek if an STD screening was needed, and Ms. Schoubroek stated, "well, you never know, you might as well." Ms. Cartinez performed a full STD screening as well as a vaginal examine and obtained a vaginal culture. The STD screen was negative.

Brandy Goins worked with Project Celebration as a forensic interviewer. She was recognized as an expert forensic interviewer in child sexual abuse cases. She interviewed E.H. on February 27, 2013. E.H. indicated that she recently spoke to Ms. Phaup, her church youth director, about Defendant on their way to E.H.'s house. E.H. stated that Defendant molested her. E.H. specified the molestation took place from the time she was six years old until she was twelve. E.H. nodded negatively when asked, "when is the last time you remember it happened, how do you know it was twelve years old, do you know?" E.H. indicated she was fourteen years old at the time of the interview. E.H. thought the last incident occurred in Defendant's truck. E.H. stated her mother, grandmother, and close friends knew about the molestation.

When asked how Defendant got to her, E.H. stated, "I think it was like during Christmas or something and I had to sleep in the bed with him that night." E.H. further stated, "[b]ecause we had family members over." E.H. was then questioned as follows:

Ms. Goins: Okay. So how do you know that you were molested?

Juvenile: Because it happened.

Ms. Goins: What happened?

Juvenile: First it was touching and then it led to more.

E.H. stated the incidents probably happened twice a month, as Defendant was a truck driver, and he "came in" twice a month. E.H. was touched in private places. The molestation began the night E.H. went to bed with Defendant. E.H. stated she was lying in bed, and he touched her. E.H. pointed out where she was touched on a drawing provided by Ms. Goins. The vaginal and buttocks areas were circled on the picture of the female.

E.H. said Defendant used his hand to touch her outside her clothing. E.H. indicated the Defendant subsequently touched her under her clothes. When asked how old she was when this occurred, E.H. shrugged. E.H. was further questioned as follows:

> Ms. Goins: Okay, okay. And when it went further, was that shortly after that or you said you don't remember how old you were at all?
>
> Juvenile: (nodding negatively)
>
> Ms. Goins: Okay. So when is the first time you remember him going underneath your clothes?
>
> Juvenile: (nodding negatively)
>
> Ms. Goins: You don't remember what grade you were in or anything?
>
> Juvenile: (Nodding negatively)
>
> Ms. Goins: How did that happen, do you remember where you were?
>
> Juvenile: (nodding negatively)
>
> Ms. Goins: Were you still living by the school in Zwolle?
>
> Juvenile: I don't know.
>
> Ms. Goins: Okay. It's okay. When he went under your clothes did he say anything to you?
>
> Juvenile: (Nodding negatively)

14

E.H. subsequently indicated the Defendant used "[h]imself" when touching her under her clothes. She indicated what part of his body he used on a drawing by circling the genital area of the male body. She indicated this occurred more than one time. E.H. was further questioned as follows:

Ms. Goins:    Okay. How many times do you think it was, more than five times?

Juvenile:  (nodding affirmatively)

Ms. Goins:    More than ten?

Juvenile:  (nodding affirmatively)

Ms. Goins:    Did it happen every time during that two weeks-- I mean the two times a month?

Juvenile:  (nodding affirmatively)

Ms. Goins:    So would you say it would be more than twenty times?

Juvenile:  (nodding affirmatively)

Ms. Goins:    Okay. And what did you do when that was happening?

Juvenile:  (no response)

Ms. Goins:  Did you ever tell him to stop?

Juvenile:  (nodding affirmatively)

Ms. Goins:  Okay. And what did he say when you would tell him that?

Juvenile:  (shrugging)

Ms. Goins:  Did he ever tell you not to tell anyone?

Juvenile:  (nodding affirmatively)

E.H. was further questioned about Defendant touching her with his private part as follows:

Ms. Goins:    It went inside you?

Juvenile:  (nodding affirmatively)

15

Ms. Goins: And did it go inside you in both the places you circled on you?

Juvenile: (nodding affirmatively)

Ms. Goins: So it went in the front and the back?

Juvenile: (nodding affirmatively)

Ms. Goins: And how do you know it went inside?

Juvenile: (shrugging)

Ms. Goins: I need you to tell me what that felt like and you can use any word you need to use. Did it feel-- did it hurt? Did it feel good? Did it feel uncomfortable?

Juvenile: (no response)

Ms. Goins: Okay. Do you remember how you were laying or were you sitting or standing up or you don't remember?

Juvenile: (Nodding negatively)

She did not remember how the Defendant was dressed during the incidents. E.H. also told Ms. Goins that Defendant tried to bribe her with items such as toys and candy. E.H. stated she had told Defendant that she would tell someone if the abuse did not stop. She did not recall when she told him that.

E.H. stated the first person she told about the abuse was her aunt, Ms. Thompson. She described the events surrounding her disclosure as follows:

Well, one morning I was sleeping and my aunt came over but my grandma was still sleeping and, uh, so she had woke me up so she was just talking to me before my grandma got up and she goes sometimes I think that your grandpa touches you and then I just started crying so she knew.

E.H. stated that Ms. Thompson told E.H.'s grandmother, Ms. Mallette, who said nothing. E.H. shrugged when asked if her grandmother saw anything happen to her.

16

E.H. stated that her mother took her to the doctor, who was a man, when she found out about the abuse. The doctor looked at her and said everything was okay.

When asked what she thought about Defendant, E.H. said she loved him. E.H. later stated Defendant was the only way they had money, as he was the only person that worked. When asked why Defendant gave the family money, E.H. stated, "'[c]ause my grandma said that if he doesn't he's going to jail." E.H. heard this during a phone conversation that her grandmother was having. E.H. indicated that her mother knew about the money, and that Defendant gave them $500 a month. E.H. stated that Defendant sent the money to the bank. She stated he did not live with her. Additionally, she indicated that her grandmother was not married to Defendant. E.H. said her grandmother had been divorced "[e]ver since I told her." E.H. last saw Defendant on her birthday in December, and he brought her a cake.

Ms. Goins never asked E.H. if anyone other than Defendant had been abusing her.

E.H. testified at trial. She was fifteen years old at that time. E.H. reported the abuse to Ms. Phaup. She reported being Defendant's favorite, as he bought her toys and spoiled her, and he did not treat the other grandchildren the same.

She indicated that she was "around" six years old the first time something happened to her. She lived in a house by the school at that time. She indicated that during that incident, Defendant rubbed her vagina over her clothes with his hands. Defendant then began rubbing her vagina under her clothing with his hands and later touched her vagina with his penis. E.H. was further questioned about the touching as follows:

Q     Well, let's talk about that. How would he touch your vagina with his penis?

A     (no response)

. . . .

Q     When your papaw would touch you with his penis, was it erect?

A     Not that I remember.

Q     Okay. When he touched you with his penis, did it ever hurt?

A     No, ma'am.

Q     Did you ever bleed?

A     No, ma'am.

Q     Did it ever feel good?

A     Yes, ma'am.

Q     When he would touch his penis to your vagina, what would-- would he be doing anything with his body while his penis was touching your vagina?

A     Moving.

E.H. stated there was never a time that Defendant touched her inappropriately while they were swimming at the lake.

E.H. recounted reporting the abuse to Ms. Thompson, who called Ms. Schoubroek.  E.H. talked to her mother about the abuse, but she did not go into detail.  She and her mother discussed the police, and E.H. did not want to call them.  When asked if Defendant continued to live with her, E.H. stated, "[h]e didn't really live there."  After her report, E.H. was never left alone in the room with Defendant again.  E.H. testified that Defendant supported the family, and she once heard her grandmother tell Defendant she would have to tell the cops because he could not get her the money.  Ms. Schoubroek was in the room when this

18

occurred and "got mad and threw her computer down and said that if my grandma told then they would get in trouble too and she started packing her stuff."

E.H. saw Defendant on her birthday and at Christmas. She spoke to him on Ms. Phaup's phone after police were involved. She called Defendant to tell him she forgave him.

E.H. said Defendant "mostly came in on the weekends" and had some holidays off. When asked if Defendant ever stayed with "y'all" when he came in, E.H. stated: "Yes, ma'am."

E.H. testified the abuse occurred in the white house next to the Zwolle school, the house in the "projects," and at 29 Granny Lane. When asked if the abuse occurred anywhere else, E.H. said no.

Defense counsel read a statement prepared by E.H., which was attached to the amended bill of particulars, as follows:

> I'm going to read the document and ask you if this is what you wrote, okay. How it all started. I was six years old, a kindergartner, lived in Zwolle and went to Zwolle school. Lived in a big two story house, four bedrooms and I think two bathrooms. Life was great! My mom, her boyfriend, my grandma and papaw, me, my brother and my two sisters all lived here. My mom and her boyfriend shared a room. My grandma and grandpa shared a room. Both were downstairs. And then upstairs me and my brother shared a room and my two sisters shared a room. At the time I was the youngest but not for long. Pretty soon my mom was going to burst out another baby. Like I said, life was great. Does that sound like what you wrote?

E.H. agreed that she wrote the statement. The statement was marked as Defense Exhibit 1 and State's Exhibit 13.

E.H. testified she had also been abused by her uncle, Johnny.

Gage Miles testified Defendant was his grandfather. He stated he had met Ms. Schoubroek but had never met E.H. He saw Defendant on weekends when he was growing up. There were no similar allegations about Defendant involving his

19

family. His seven year old brother looked to Defendant as a father figure. Defendant bought him gifts at Christmas and his birthday.

Sherry Miles testified she was Defendant's daughter. Ms. Miles testified about Defendant's relationship with her seven year old son. She indicated she had met Ms. Schoubroek once or twice and had never met E.H. There had been no similar rumors about inappropriate behavior in her family, and she never witnessed inappropriate behavior by her father while she was growing up. Her friends enjoyed spending time with Defendant. She went on several trips with Defendant, who was a truck driver, as a child. She completely trusted Defendant and believed he would not hurt a child. Ms. Miles stated that Defendant "was giving all of his finances basically were going to support that family whoever was living in the house at that time. And I know my dad was afraid to withdraw that money because certain threats had been made against him."

Shelby Coats testified that Ms. Schoubroek was her mother, and Defendant was her step-grandfather. She had known Defendant since she was two years old. He had never done anything inappropriate to her. She spent almost the whole summer between eighth and ninth grade on the road with him. He would give her money or buy her what she needed. She never witnessed anything inappropriate between Defendant and E.H., and the way he treated E.H. did not make her uncomfortable. She did not see Defendant single out E.H. Ms. Coats testified regarding problems she had with her mother when her son was born. Ms. Coats stated that Ms. Schoubroek told nurses at the hospital that Ms. Coats did not deserve her son, and she was going to take him.

20

Ms. Coats moved out of Ms. Schoubroek's home when she was thirteen for approximately a year and a half. She returned and moved out again when she was sixteen. Ms. Coats testified that money was tight.

Jackie Bertucci, an attorney, testified that Defendant is her uncle. She indicated that she never witnessed him do anything inappropriate with children, that she never heard rumors about such behavior by Defendant, and that she had never met E.H., Ms. Schoubroek, or Ms. Thompson.

Tabitha Adams testified that Ms. Schoubroek was her mother and that Defendant was her grandfather. Ms. Adams lived in the home with E.H. until the fall of 2010. She never saw Defendant act inappropriately with E.H., and E.H. never reported any inappropriate behavior to her. Ms. Adams had been on a road trip with Defendant, and he had never done anything inappropriate to her. It did not appear to her that E.H. was singled out by Defendant for special attention. Ms. Adams testified that Defendant was the family's financial supporter, as her mother and grandmother would not work.

Defendant testified he was sixty-three years old and was a truck driver. He was home every two weeks. He denied the allegations made by E.H. He indicated that one to two years prior to trial he came in from work and his wife was upset. There were rumors that Johnny, his wife's brother, had "messed with" E.H. Defendant did not report the matter to police because his wife asked him not to inasmuch as she did not want her brother to go back to jail.

Defendant indicated that he was still legally married to his wife, but they did not see each other. A notary had drawn up paperwork indicating that they were divorced. However, they still had to take the paper to the courthouse to have it "legally done." He had an agreement with his wife to pay her $200.00 a week for

21

two years. After two years, the two were going to get divorced. He paid his wife weekly because "they said they was [sic] going to accuse me of stuff if I didn't." Defendant testified he was the family's sole means of financial support. Defendant also stated that the police did not give him a chance to tell them that if he did not pay the $200.00 that he would be accused of "stuff." He stated that he and Ms. Mallette had a verbal agreement that he would pay her. He did not think about telling police at the time about the threat. He sent Ms. Mallette money even after the police questioned him and only stopped paying her when he got arrested. He did not ask for return of the care he loaned Ms. Schoubroek until just a few weeks before trial.

Defendant indicated he tried to treat all of the kids the same. He stated that E.H. lied a little bit. As an example, he stated that E.H. lied to her mother about being at parties.

Defendant admitted there was a time when he, E.H., Ms. Adams, and Ms. Coats were at Tranquility Bay swimming. However, he did not have E.H. get into bed with him. Defendant denied doing anything inappropriate with any children. He did not recall being alone with E.H. because her brother J. was always with them.[5] However, he had been alone with Ms. Coats and Ms. Adams.

The Defendant stated he was telling the truth, and he would have submitted to a voice stress analysis test, as mentioned in his statement to police. However, he was not given an opportunity to take the test by police, and his attorney did not set up such a test. He testified that he guessed E.H. wanted attention, and there was a lot of drama when he was living with "these people."

---

[5]The child is referred to as [J.] throughout the trial transcript.

After hearing the testimony, the trial court found Defendant guilty of molestation of a juvenile under the age of thirteen.

The Defendant contends his conviction should be reversed for the following reasons: 1) E.H.'s testimony was internally inconsistent, vague, and devoid of any level of specificity; and 2) the State did not present any evidence that he used force, threats, intimidation, or influence upon E.H. by virtue of having a position of supervision or control over her in order to facilitate the commission of a lewd or lascivious act upon her.

Defendant was convicted of molestation of a juvenile, which is defined, in pertinent part, as follows:

> A. (1) Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile's age shall not be a defense.

La.R.S. 14:81.2.

> The essential elements of the crime of molestation of a juvenile, each of which the prosecution must prove beyond a reasonable doubt, are (1) the accused was over the age of 17; (2) the accused committed a lewd or lascivious act upon the person or in the presence of a child under the age of 17; (3) the accused was more than two years older than the victim; (4) the accused had the specific intent to arouse or gratify either the child's sexual desires or his or her own sexual desires; and (5) the accused committed the lewd or lascivious act by use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm or by the use of influence by virtue of a position of control or supervision over the juvenile.

*State v. Terry*, 47,425, pp. 25-26 (La.App. 2 Cir. 11/21/12), 108 So.3d 126, 142, *writ denied*, 12-2759 (La. 6/28/13), 118 So.3d 1096.

Defendant argues that E.H.'s uncorroborated testimony is fraught with internal conflicts such that no rational trier of fact would reasonably rely on her testimony to find him guilty beyond a reasonable doubt. Defendant asserts that in addition to being vague and uncertain, the details contained in E.H.'s video interview and trial testimony were internally inconsistent and irreconcilable.

Defendant notes that E.H. testified that he penetrated her vaginally and anally but, at another point, stated that he only touched her vaginal area. He points out that E.H. could not provide any concrete details about where or when any particular act occurred other than the initial incident. Defendant also notes that E.H. testified he never said anything to her when he committed the acts but also testified that he attempted to bribe her with toys and candy. Defendant asserts that E.H. did not remember any incidents happening other than in residences where her family lived, but later said she thought the last incident occurred in the Defendant's truck. Defendant points out that E.H. did not indicate when or where the offense occurred, how old she was at the time, what she was wearing, or provide other details of the offense without being prompted. Defendant also notes that E.H. said that Defendant touched her under her clothes with his hands and later stated Defendant used his penis after being prompted by the interviewer. Defendant notes that E.H. did not recall Defendant ever touching her with an erect penis yet she stated he vaginally and anally penetrated her. He points out that E.H. shrugged when asked how she knew Defendant's penis went inside her. Defendant asserts E.H.'s testimony regarding penetration was rejected by the trial court when it found him guilty of molestation of a juvenile.

Defendant asserts that the trial court's granting of the motion for new trial raises serious doubt about whether the trial court actually believed E.H. was a

credible witness and the inconsistencies in E.H.'s testimony, and, as a result, this court should not completely defer to the trial court's initial judgment of conviction.

The trial court had the opportunity to observe the demeanor of the parties. The trial court had the ability to compare E.H.'s advocacy interview with her trial testimony and Defendant's police interview with his trial testimony. Defense counsel cross-examined E.H. concerning the alleged acts and had the opportunity to point out the differences between E.H.'s accounts of the events.

The details surrounding all of the acts other than the first are not known. Regardless, during both her interview and testimony, E.H. indicated Defendant touched her vagina over her clothing and under her clothing with his hand numerous times. The only difference between the interview and her testimony was regarding the act of penetration. During the interview, E.H. stated the Defendant penetrated her vaginally and anally, without describing how she knew penetration occurred, and, at trial, she testified he touched her vagina with his penis.

In *State v. Willis*, 05-218 (La.App. 3 Cir. 11/2/05), 915 So.2d 365, *writ denied*, 06-186 (La. 6/23/06), 930 So.2d 973, *cert. denied*, 549 U.S. 1052, 127 S.Ct. 668 (2006), the defendant was charged with, among other things, four counts of forcible rape, one count for each year from 1992 through 1995. "C.M. [the victim] testified that the Defendant had sex with her from 1991 to 1995. There were no details regarding the number of times the Defendant had sexual intercourse with C.M. or the dates that these offenses occurred, with the exception of the testimony regarding March 3, 1994." *Id.* at 376. After finding the evidence was not sufficient to support the defendant's convictions, this court discussed whether the evidence was sufficient to support convictions for the responsive verdict of sexual battery. This court stated: "C.M. testified that the Defendant had

25

sexual intercourse with her on a continual basis from 1991 to 1995. Accordingly, the State proved the Defendant touched C.M.'s genitals with a part of his body." *Id.* at 378. This court further found the defendant committed sexual battery against C.M. in 1992, 1993, and 1994. This court found that the State failed to prove the elements necessary to support an offense occurring in 1995.

In accordance with this court's ruling in *Willis*, the State need not present the details of each offensive act to support Defendant's conviction. Furthermore, this court has upheld convictions for sexual offenses wherein there were alleged inconsistencies in the reports and/or testimony of the victims. *See State v. Pennywell*, 13-1376 (La.App. 3 Cir. 5/7/14), 139 So.3d 587; *State v. Duplantis*, 13-424 (La.App. 3 Cir. 11/27/13), 127 So.3d 143, *writ denied*, 14-283 (La. 9/19/14), 148 So.3d 949; *State v. R.K.*, 10-982 (La.App. 3 Cir. 5/11/11), 64 So.3d 426; *State v. Schexnaider*, 03-144 (La.App. 3 Cir. 6/4/03), 852 So.2d 450. Therefore, Defendant's arguments regarding inconsistencies in E.H.'s recounting of the events are immaterial to the sufficiency of the evidence.

Defendant further argues that the State failed to prove the necessary element of use of force or influence. Defendant asserts:

> The "use of influence" element in La. R.S. 14:81.2 is the functional equivalent of a non-physical use of force. This alternate means of accomplishing the act of molestation-where, instead of force or threats, an accused uses a position of supervision or control over a juvenile in order to influence the juvenile into allowing the lewd or lascivious act to occur-is what separates the crime of molestation from other sexual crimes against juveniles that do not involve the manipulation of a victim by a person with authority over that victim. In order to constitute molestation, more is required than simply *having* a position of supervision or control; the offender must actually use the influence gained by that position in order to overbear the will of the victim and accomplish the act complained of.

Defendant notes the supreme court clarified the difference between indecent behavior and molestation in *State v. Leblanc*, 506 So.2d 1197 (La.1987). Therein, the supreme court stated:

> The definition of the new crime of molestation of a juvenile was a verbatim repetition of the definition of the crime of indecent behavior with a juvenile, with the addition of the essential element of the use of force (or use of some other enumerated behavior of the accused). It is therefore evident that the 1984 Legislature intended to create two distinct grades of crimes involving lewd acts with juveniles, the distinguishing element being the use of force (or use of some other enumerated behavior).

*Id.* at 1199 (footnote omitted). The supreme court further stated:

> A genuine construction of La.R.S. 14:81.2 as part of the overall criminal law pertaining to lewd acts with juveniles therefore leads to the conclusion that the Legislature contemplated a requirement of something more than the mere exertion of physical effort necessary to commit the lewd act. Properly construed, the "use of force" element refers to the forcible means of overcoming the will or the resistance of the victim, and this additional essential element requires a use of force in addition to any mere touching or minimum effort exerted in performing the lewd act. This added element of force must be substantially greater than or substantially different from the force which is necessary to commit the less serious offense of indecent behavior with a juvenile. See *People v. Cicero*, 157 Cal. App.3d 465, 204 Cal. Rptr. 582 (Ct.App. 1984).
>
> . . . .
>
> In the present case, defendant exerted a minimal amount of physical effort when he grabbed the boy's genitals. That lewd act upon the boy's person constituted the crime of indecent behavior with a juvenile. Some additional force designed to overcome the boy's will or his resistance to participation in the lewd act was required to constitute the crime of molestation of a juvenile. Proof of defendant's holding the boy's arm, for example, while he grabbed the genitals might have been sufficient to fulfill the "use of force" requirement of the greater crime. However, there was no evidence whatsoever of any additional force designed to overcome the boy's will or his resistance to the lewd act. Because the prosecution failed to prove the use of (or the specific intent to use) any force other than the effort necessary to commit the lewd act upon the boy's person, there was insufficient evidence of an essential element of the greater offense of molestation (or attempted molestation) of a juvenile.

*Id.* at 1200-01 (footnote omitted).

Defendant notes that he was charged with aggravated rape of a child under thirteen years of age. Thus, the State was not required to adduce any evidence regarding the means by which the sexual conduct was accomplished or to present evidence that the victim was forced to participate in a lewd or lascivious act, whether physically or by virtue of influence. Defendant argues that, as a result, the record is devoid of any evidence establishing that E.H. was forced or influenced to participate in the sexual conduct alleged.

Defendant claims that the fact that a person is a grandfather of a juvenile does not transform every lewd or lascivious act into a crime of molestation. Instead, according to Defendant, the person must use the influence gained by virtue of such a position in a manner that acts as an "an equally culpable substitute for the other enumerated means by which molestation is accomplished." Defendant notes that E.H. did not testify that he was authorized to impose discipline upon her or that he had a position of authority over her. Defendant also reminds the court that E.H. did not testify that she was afraid of the consequences of prohibiting him from committing the alleged acts or that he used any authority over her to accomplish them. Defendant pinpoints E.H.'s testimony that Defendant would bribe her with toys and other things but argues that this falls short of proving the elements of the offense of molestation.

> The State asserts the offense was committed by:
>
> [U]se of (a) force, violence, duress, menace, psychological intimidation, or threat of great bodily harm, or (b) influence by virtue of position of control or supervision over E.H. as he was the sole means of financial support for her family. R. 374. The defendant would stay at the victim's home when he was not working and abused her when no one was around. R. 368, 374.

28

According to *Leblanc*, 506 So.2d 1197, molestation of a juvenile requires a use of force in addition to the touching or minimum effort exerted in performing the lewd act against the victim. We find that the evidence presented does not indicate the use of force, violence, duress, menace, psychological intimidation, or threat of great bodily harm by Defendant in the commission of the acts against E.H. Thus, this court must determine whether Defendant used influence by virtue of a position of control or supervision over E.H. to commit the offense.

Supervision and control was discussed by this court in *State v. Roy*, 15-515, pp. 10-13 (La.App. 3 Cir. 11/4/15), 177 So.3d 1103, 1109-11, as follows:

> We find there was sufficient evidence that Defendant committed the molestation of the victims while the victims were under his supervision and control. The jurisprudence has interpreted the "supervision and control" element of molestation of a juvenile to be satisfied by someone who has emotional control over the victim, as well as by someone who is a live-in boyfriend, non-custodial parent, babysitter, relative, friend, a pastor, and neighbor. *See State v. Anderson*, 10-779 (La.App. 5 Cir. 3/27/12), 91 So.3d 1080; *State v. Davis*, 47,599 (La.App. 2 Cir. 1/16/13), 108 So.3d 833, *writ denied*, 13-381 (La.9/20/13), 123 So.3d 163 (citing *State v. Ellis*, 38,740 (La.App. 2 Cir. 8/18/04), 880 So.2d 214); *State v. Goss*, 46,193 (La.App. 2 Cir. 5/18/11), 70 So.3d 6.

> In *Anderson*, the defendant was the victim's school bus driver until the victim graduated in the eighth grade. When the victim was fourteen, she began to have more contact with the defendant, with whom she shared a mutual interest in music. The defendant would pay visits to the victim's classroom and leave notes in her locker. The victim's parents allowed the victim to accompany the defendant to a recording studio so she could play the piano for a song the defendant wrote. Instead of taking the victim straight home, the defendant stopped by his home to show the victim his band room and waterbed. The defendant kissed the victim while at his home. During the drive to the victim's house, the defendant told the victim that there were going to have an "adult relationship" that, if exposed, would cause his six-year-old daughter to become homeless. The victim's relationship with the defendant continued to escalate, and the two began having sex. The relationship continued until just after the victim turned sixteen. In response to Anderson's argument that the State failed to prove he exercised control or supervision over the victim, the fifth circuit stated:

In this case, L.L.P. testified that she and the defendant engaged in digital penetration, oral sex, and penile/vaginal intercourse while they were alone in his home. The defendant asked for and received permission from D.P. to drive L.L.P. to the recording studio where he was recording music. The defendant drove L.L.P. to his home in Marrero. The defendant subsequently had L.L.P. cut her window screen for the purpose of picking her up in the middle of the night. The defendant provided L.L.P. with alcohol and pornography when he was the only adult present.

In addition, the defendant exercised a significant level of emotional control over L.L.P. The defendant was in a position of trust and authority relative to L.L.P. The defendant told L.L.P. that if she revealed the nature of their relationship to anyone, he would have to go to jail and his daughter would be homeless. Accordingly, we find that the State demonstrated that the defendant had "control or supervision" over L.L.P.

*Id.* at 1086 (citation omitted).

In *Davis*, the second circuit upheld Davis' convictions of three counts of molestation of a juvenile. The court found the element of supervision or control was satisfied as to one of the victims when Davis was the victim's uncle, lived with the victim, and was alone with the victim during one of the incidents. As to the other two victims, the element of supervision or control was satisfied by the fact that Davis was their mom's live-in boyfriend and was the father of their youngest sibling. *See also State v. Kennon*, 34,445, 34,456 (La.App. 2 Cir. 2/28/01), 781 So.2d 734, where the court found that Kennon, the live-in boyfriend of the victim's mother, had control and supervision of the thirteen-year old victim while the victim's mother was away at work.

In this case, Defendant was the live-in boyfriend of the victims' mother and was significantly older than the victims. At trial, A.B. testified that she believed she was in the seventh grade (age thirteen) when Defendant came to live with them. A.B. also testified that she and Defendant talked about the fact that when she turned eighteen he would be forty. C.A. testified that she was fifteen when Defendant began living with them, and Defendant was thirty-five.

In addition, the sexual incidents occurred at the home while Defendant was living there. Even though A.B. was staying with her cousin when the first sexual incident occurred, A.B. was at her mom's house "being a regular kid digging in [her] mom's jewelry box" while

her mom was at work. Defendant was the only adult in the house during the first sexual incident between Defendant and A.B. According to C.A., her mother was sleeping when the sexual molestation to her occurred. Defendant acted as a father-figure in the house. Both A.B. and C.A. testified that before the first sexual incident occurred, they looked to Defendant as a father figure. A.B. testified that at times, Defendant spoke to them as a step-father, telling them that they should treat their mom better. A.B. also testified that although Defendant would buy her extra things, he would buy for all of her brothers and sisters when her mom was around, giving the appearance that Defendant assumed a "father-like" role to all of the siblings. Finally, Defendant exerted emotional control over A.B. by leading her to believe that they would start a life together when she turned eighteen.

Although there was no testimony that Defendant babysat or took care of the victims, there was evidence that Defendant lived in the home with the victims, acted as a father figure towards the victims, and exercised emotional control over the victims. Therefore, we find the evidence was sufficient to support the jury's finding that Defendant sexually molested the victims by the use of influence by virtue of a position of supervision or control over them in violation of the provisions of La.R.S. 14:81.2.

The victim in *State v. Davis*, 47,599, p. 3 (La.App. 2 Cir. 1/16/13), 108 So.3d 833, 837, *writ denied*, 13-381 (La. 9/20/13), 123 So.3d 163, was home alone with the defendant because her mother had "gone to the country."

Defendant cites the following cases in support of his claim that the evidence is insufficient: *State v. Ragas*, 607 So.2d 967 (La.App. 4 Cir. 1992), *writ denied*, 612 So.2d 97 (La.1993); *State v. Strother*, 43,363 (La.App. 2 Cir. 8/20/08), 990 So.2d 130, *writ denied*, 08-2289 (La. 5/15/09), 8 So.3d 580; *State v. Onstead*, 03-1413 (La.App. 5 Cir. 5/26/04), 875 So.2d 908; and *State v. Rideaux*, 05-446 (La.App. 3 Cir. 11/2/05), 916 So.2d 488.

In *Ragas*, 607 So.2d 967, the defendant was charged with attempted molestation of a juvenile for acts committed against his wife's thirteen-year-old niece. The victim went to the defendant's home to visit the defendant's daughter and waited for the girl in her room. The defendant subsequently entered his

daughter's bedroom. He then pulled the victim on top of him while lying in bed, hugged and kissed her, and touched her breasts and buttocks. The court concluded the victim went to defendant's house without his prior knowledge or consent and was able to leave the house at will. The only evidence suggesting any control or supervision by defendant was the victim's positive response to the State asking if the defendant looked after her and Rolanda when they were playing sometimes. The victim's mother testified that there were no arrangements made with defendant or his wife about keeping the victim that day. The court concluded the evidence showed that the victim was under no constraints to remain with her uncle nor be subject to his supervision.

In *Strother*, 990 So.2d 130, the court found evidence that defendant was the only adult present at a party at which he furnished alcohol to the juvenile victim and that he refused to let her leave the house in the absence of a designated driver was sufficient to prove beyond a reasonable doubt that defendant used his influence by virtue of position of control or supervision over the juvenile.

In *Onstead*, 875 So.2d at 913-14, the court stated:

[T]he record contains evidence, which if believed by the trier of fact, appears to support a finding that Onstead molested J.M. by the use of influence by virtue of his position of control or supervision over J.M. Onstead testified that he asked J.M.'s mother for permission to have her children at his home. His testimony indicates that he had rules for the children to follow at his home, in that he did not allow the children upstairs. Further, the record reflects that Onstead performed caretaking functions for J.M. while she was at his home. When she soiled herself at his house, he cleaned her underpants and told her to wash her hands. With Mrs. M.'s permission, he took J.M. on errands, picked her up from school, and brought her to gymnastics. He bought her toys, clothes and other gifts. Further, J.M.'s testimony indicates he compelled her silence by telling her that she would not be allowed to come to his house anymore if she revealed that he had made her touch him.

In *Rideaux*, 916 So.2d 88, the court found the evidence was insufficient to support the defendant's conviction for molestation. On the first of the occasions, the victim's mother was home when the incident occurred and any baby-sitting function had ceased. In the second incident, the victim was permitted by her mother to be home alone, sick from school, and the defendant was asked to bring her lunch, not to baby-sit or supervise her. On the third occasion, the victim was at the defendant's home with his wife for the purpose of helping her with their infant son while she performed housework. There was no testimony that the wife left the home for any reason and left the victim under his supervision or control during that visit.

The evidence in the instant matter establishes that Defendant was E.H.'s step-grandfather. Thus, he was in a position of trust. During her advocacy interview, E.H. nodded negatively when asked if Defendant said anything when he went under her clothing. However, he told her not to tell anyone about his behavior. She stated Defendant tried to bribe her with items such as toys and candy. However, she did not testify that Defendant said anything about the abuse when presenting these items to her.

E.H. reported that Defendant was her family's only source of money but was not asked and did not indicate how old she was when she realized or was told this. There was no indication that Defendant told E.H. that he would withhold financial support if she did not allow the acts to continue or if she reported his behavior. In fact, Defendant continued to support the family until he was arrested. According to E.H., the continued financial support was the result of threats by Ms. Mallette that she would report Defendant's behavior to police if he did not pay her.

There was no testimony that Defendant was in a position of authority, as he was not with E.H. on a daily basis because he was a truck driver who was home twice a month and on holidays. At trial, E.H. stated that after her report, she was never left alone in the room with Defendant again, but there was no testimony by E.H. about being home alone or alone in a room with Defendant prior to her report. During her interview with police, Ms. Schoubroek stated she never left her children alone with Defendant. There was testimony that the initial act of abuse occurred at Christmas while E.H. was in bed with Defendant. However, there was no testimony as to whether others were present in the room at that time, and Ms. Schoubroek told police that Defendant was in one Christmas but did not live in the home at that time, and E.H. slept with her on that occasion. However, E.H. said in the statement attached to the amended bill of particulars that Defendant lived in the same house with her when the initial act occurred. There was no testimony about where Defendant lived during the remainder of the period listed in the indictment.

There was no testimony that the Defendant acted as a father figure. Additionally, there was no testimony that he babysat or took care of E.H. while he was with her.

Based on the evidence presented by the State, we cannot say the State proved that Defendant committed the offense via influence by virtue of a position of control or supervision over E.H. Accordingly, all elements necessary to support Defendant's conviction of molestation of a juvenile were not proven by the State.

Under La.Code Crim.P. art. 821(C), "an appellate court that finds 'the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense . . . may modify the verdict and render a judgment of conviction on the lesser included responsive offense.'" *State v.*

34

*Teague*, 04-1132, p. 9 (La.App. 3 Cir. 2/2/05), 893 So.2d 198, 205. This court must, therefore, determine whether any responsive offense was proven.

Indecent behavior with a juvenile is a responsive offense to aggravated rape of a child under thirteen. La.Code Crim.P art. 814(A)(8.1). Indecent behavior with juveniles is defined as the commission of "[a]ny lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons" with the intention of arousing or gratifying the sexual desires of either person. La.R.S. 14:81. Lack of knowledge of the child's age shall not be a defense. *Id.*

As previously discussed, Defendant's act of touching E.H.'s vagina over and under her clothing with his hand and touching her vagina with his penis constituted lewd and lascivious acts. E.H. testified that the acts occurred from the time she was six until she was twelve, and she was fifteen years old at the time of trial. Defendant was sixty-three years old at the time of trial. Therefore, it is clear that Defendant was more than two years older than E.H. at the time the offenses occurred.

In addition to the above elements, the State must also prove that Defendant had the specific intent to arouse or gratify his sexual desires or those of the victim. *Teague*, 893 So.2d 198. Defendant's acts of touching E.H.'s vagina in the manner described by her were deliberate, intentional, and could have no other purpose than to arouse his sexual desires.

Therefore, we find that the evidence, when viewed in a light most favorable to the prosecution, proves all elements of indecent behavior with a juvenile, who was under the age of thirteen during a portion of the time period listed in the bill of information, beyond a reasonable doubt. Accordingly, the Defendant's conviction

and sentence rendered by the trial court is vacated, a judgment of guilty of indecent behavior with a juvenile is rendered, and the matter is remanded for sentencing in accordance with this court's opinion.

## ASSIGNMENT OF ERROR NO. 2

In his second assignment of error, Defendant contends that his sentence is constitutionally excessive. Because the Defendant's conviction and sentence for molestation of a juvenile is vacated, this assignment of error is moot.

## CONCLUSION

Defendant's conviction and sentence for molestation of a juvenile is vacated, a judgment of guilty of indecent behavior with a juvenile is entered, and the case is remanded for sentencing.

**VACATED, RENDERED IN PART, AND REMANDED.**