Judge Marion F. Edwards, Pro Tempore | defendant, Bryant McClendon, appeals his conviction and sentence for molestation of a juvenile 'in violation of La. R.S. 14:81.2. We affirm the conviction and remand the matter to the district court for a ruling on defendant’s outstanding motion to reconsider sentence. We reserve defendant’s right to appeal the sentence resulting from the district court’s ruling on the motion to reconsider sentence. PROCEDURAL HISTORY On July 29, 2011, Bryant McClendon was charged with indecent behavior with a juvenile in violation of La. R.S. 14:81 involving alleged behavior with R.P., the minor daughter of a woman with whom McClendon had a relationship in the early 2000’s. He entered a plea of not guilty to the charge. The trial court found sufficient probable cause to substantiate the charge at a preliminary hearing on July 16, 2012. On March 26, 2013, the State filed a notice Of intent to offer evidence of similar crimes, wrongs, and/or acts involving previous sexually assaultive behavior pursuant to La. C.E. art. 412.2. The trial court ruled this evidence admissible. On |aJanuary 20, 2016, the bill of information was amended to charge McClendon with molestation of a juvenile, in violation of La. R.S, 14:81.2. After a trial on the merits held on July 14, 2016, the jury returned a verdict of guilty of molestation of a juvenile. McClen-don was sentenced on July 27, 2016 to five years at hard labor to -run concurrently with any other sentences, with credit.for time served, and assessed $1,286.50 in costs.. On that same day, defense counsel filed a motion for. appeal and a motion to withdraw as counsel. Both motions were granted, and the trial court appointed the Louisiana Appellate Project to represent McClendon on appeal. On July 29, 2016, the defense filed a motion to reconsider sentence that remains outstanding. FACTS The victim, R.P., who is now twenty-seven, testified that when she was a child, she. and her mother lived • with Bryant McClendon. Her three younger half-siblings, B.M.l, B.M.2 and B.R.M, also lived in the home. All four children have the same mother, but McClendon is the father of R.P.’s three half-siblings. When R.P, was in middle school, the family lived in a two-bedroom home in New Orleans East. Her mother and McClendon shared one bedroom, and R.P. shared the second bedroom with her three half-siblings. The children’s bedroom had a set of bunk beds. R.P. and B.R.M. slept in the upper bunk and the other two children slept in the lower bunk. R.P. testified that when she was very young she had a good relationship with McClendon. However, that relationship changed when she was in middle school. R.P. described how the normal play became a “little more touchy-feely,” McClen-don would make her sit on his lap while he touched her breasts. She could Rnot recall the exact time,the touching changed and became uncomfortable, but she remembered it was around the time the defendant drove her to a dance when she was in the eighth grade. , Things got worse for R.P. when McClen-don started coming into the bedroom at night after all the children were asleep. R.P. described how she woke up to find McClendon standing on the side of the bunk bed with his erect penis exposed. McClendon put R.P.’s hand on his penis and began to move her hand up and .down. R.P. stated that she didn’t know what to do, so she pretended to still be asleep and tried to turn over away from him to -make him stop, R.P. testified that on other occasions, McClendon would touch her breast or vagina. She pushed his hand away, but he “would just put his hand back.” The sexual contact continued, and escalated over time. R.P. estimated it, was about two years later when McClendon got into the bunk with her and put his mouth on her vagina. R.P. testified that she wanted him to stop, but did not know what to do about it. She acknowledged that she did not wake any of the other children or call out to her mother. She simply tried to pretend she was still asleep. R.P. described one occasion when McClendon got into her bed and tried to penetrate her. She pushed and kicked him to try to stop him. She heard her mother call out to him and he left her room. R.P. testified that the abuse occurred between 2002 and 2004. It .stopped, in 2004 when her mother and McClendon broke up and he moved out of the home. She stated that she didn’t tell anyone about the sexual abuse until several years later when she confided in a friend. She told her mother about the abuse in 2009 and. decided to disclose the abuse to police in 2010 after speaking with her half-sister, B.M.l, over the Thanksgiving holiday. 14R.P. explained that after Hurricane Katrina, her mother and three half-siblings relocated to Texas. R.P. returned to New Orleans to live with her maternal grandparents and finish school. When she visited with the family at Thanksgiving in 2010, R.P.,learned that her sister, B.M.l, who was .about fifteen at that time, was struggling in school and began making poor decisions, including transmitting a nude photo of herself to a boy. B.M.l confided.in R.P., stating that her father was touching her inappropriately. R.P. stated that she felt guilty, and in some way responsible for the abuse her sister was enduring, because of her failure to tell anyone about the abuse when it happened. R.P., who was twenty-seven at the time of trial, testified that the sexual abuse affected her mental health. She has anger issues, as well as sexual and relationship issues, that require professional help. She explained the she has difficulty relating sex to love. Lisa Holcomb, an investigator fi-om the Children’s Assessment Center in Houston, Texas testified at trial. She stated that the Children’s Assessment Center is a child advocacy center that investigates and treats child sex abuse cases that are subsequently referred to law enforcement and the Texas Department of Family and Protective Services. Ms. Holcomb conducts forensic interviews with victims. She explained that a forensic interview is a neutral fact finding interview done by an objective party in the investigation of child sexual abuse allegations. Ms. Holcomb interviews children and intellectually disabled adults and communicates using different tools, as needed. In that capacity, Ms. Holcomb conducted a forensic interview with B.M.1 after the report of sex abuse was made to Texas authorities in 2010. At that |stime B.M.l was fifteen-years-old. A videotape of the interview was played for the jury over the objection of the defense. In the video, B.M.1 stated that she was currently living with her mother and her mother’s boyfriend in Texas where they have lived since Hurricane Katrina. She admitted that she was currently attending an alternative school after being expelled from her former school for cutting classes. B.M.l told Ms. Holcomb she has an older sister who lives in Louisiana that she “talks to about things.” She said she was brought to the center by her mother because she was sexually molested by her father. She promised to tell the truth in the interview, B.M.l said that her mother and father separated when she was much younger and she and her two siblings lived with their mother. However, they spent half the summer with their father and paternal grandmother in their home in Marrero, Louisiana. During those visits her father would “touch (her) and stuff, a lot, not like a dad should touch his child.” She explained that he would touch her chest with his hands and rub on her legs. On some occasions he would touch her over her clothes, but other times he would go under her bra and “caress” and touch her breast in a “squeezing motion.” The touches usually happened when she came out of the bathroom and would last for five or ten minutes and there was nothing she could do about it. Sometimes her father would touch her at night. Occasionally the inappropriate touching happened after he called her into his room. She estimated the sexual abuse happened about two or three times a week. On one occasion around Christmas when B.M.1 was about thirteen or fourteen, she was in her father’s bedroom with her cousin watching television. McClendon was on the computer in the same room. When her cousin left the room to go into the kitchen, McClendon locked the bedroom door. He sat back down at | ñthe computer and called B.M.l to come and see something on the computer. When she went to him, he put her on his lap. She tried to get up, but he held her down. He started touching her under her shirt and began to move her “side to side” on his lap. She stated that McClendon then put his hands in “the front part” of her pants. First, he rubbed the outside of her vagina, then “touched the inside of it for a while.” B.M.1 said the touching “felt painful-ish” and that when she tried to move McClendon’s hand he would “do it harder.” She said- that “whenever he considered himself done,” he would let her go and she could leave the room. The final incident occurred when she passed by her father’s bedroom. He called out to her to “come in real quick.” He was lying on a couch and she went into the room and sat next to him. Her father sat up and put her on his. lap. Using dolls to demonstrate the positioning, B.M.lde-scribed how McClendon touched her chest, then put his hand inside of her underwear. After touching the outside of her vagina, McClendon inserted his fingers inside “in an in and out motion.” As she tried to leave the room, McClendon asked for a kiss. After the video ended, the defense cross-examined Ms. Holcomb regarding the interview. She conceded that she did not ask B.M.l why no, one witnessed the sexual abuse or if she was promised anything in return for her statements. She acknowledged that the alleged abuse occurred years before B.M.l transmitted the nude photo of herself. Ms. Holcomb also stated that she was aware that B.M.1 spoke to police about the abuse, and Ms. Holcomb advised B.M.1 that distributing nude photos of herself could constitute child pornography. Ms. Holcomb interviewed B.M.l’s two younger siblings, who were unable to cor-, robórate the sexual abuse allegations. Ms. Holcomb admitted that her job is 17simply to collect information and provide a statement to law enforcement and child protective services, not to make a credibility judgment. Ms. Holcomb agreed that, although B.M.l seemed immature for her age, she used terminology more “consistent with a police officer.” Further, she was not aware of any medical reports demonstrating the existence of marks or bruises on B.M.1 consistent with her report of sexual abuse: Anne Troy, a nurse practitioner at the Audrey Hepburn Care Center of Children’s Hospital, was qualified as an expert to provide background for the jury on the reporting and investigation of sexual molestation. She explained that disclosure of the molestation by a child is a very difficult process because the abuser is often a person the child knows and loves. Depending on their age and development, children who are sexual abused are not sure what’s happening or why. They usually experience feelings of shame, embarrassment and guilt.- External factors, like the fear that no one will believe them, that they may be punished, or that their security will be threatened also prevent or delay the disclosure of sexual abuse. Ms. Troy did not interview the victim in this case, but stated that it is not unusual for victims to wait-months or years before disclosing the abuse. Ms. Troy also explained that, because children’s bodies heal quickly, there is a very short window of time, between twenty-four and seventy-two hours, for the collection of DNA and physical evidence of sexual abuse. She testified that several things may precipitate the belated disclosure, like the return of the perpetrator or- the fear that a younger sibling may now be at risk of abuse. Ms. Troy observed in her conversations with sexually abused children that they would often recount the episodes with much less emotion than one would | Rexpect. The reporting would be in a very matter of fact manner because they have been coping with the trauma long before the actual disclosure. According to Ms. Troy’s testimony, common behavior manifested in sexually abused children includes bed wetting, running away, fighting at school and self-mutilation. Adolescents often act out by taking on high risk activities such as promiscuity and drug, abuse which compounds the problem by putting their credibility in question. On the other hand,, some children become “A” students.and perfect children, in an effort to gain some control of their lives. The defense called B.M.1 to the stand. She confirmed the sleeping arrangements to which R.P. testified, and admitted that she had no memory of her father coming into the children’s bedroom at night when she was a child and R.P. still lived with them in New Orleans. However, she pointed out that when R.P. was thirteen or fourteen, she would have been only six or seven-years-old. B.M.l testified that she got into trouble in' school after sending a nude photo of herself to a boy. She was talking to-her mother and her-two sisters about why she was acting out in school around Thanksgiving in 2010. She decided to tell her sister, R.P., about the sexual abuse after her mother and other sister left the room. B.M.l testified that R.P. was the first person she told about the abuse that started after she moved to Texas with her mother and two younger siblings. R.P. confided in B.M.l that she too had been abused by McClendon; After that conversation, the two sisters went to tell their mother about the abuse. B.M. 1 testified that she later informed Jefferson Parish law- enforcement about the abuse,, but officials there did not follow up on the allegations after the interview. She said the Texas police did not charge her with child pornography. |flShe also stated that she told the truth in the interview at the Child Advocacy Center and was telling the truth on the stand. The other two siblings, B.M.2 and B.R.M., testified for the defense. .B.M.2 testified- that she lives with her father and her paternal grandmother in Marrero, Louisiana. She testified that she could not recall waking up to find her father in the bedroom she shared with her .three siblings in New Orleans between 2002. and 2004. She did not recall, witnessing her father doing anything inappropriate to B.M.1 in 2008, 2Ó09, or 2010. B.R.M. also testified for the defense. He stated that he was about four years old in 2002 and slept in the upper bunk with R.P. He' did not recall ever seeing his father get into the bunk at night-and never saw his father come into the room and expose his penis. On cross-examination, he admitted that he was very yóung and could have been- asleep. McClendon’s motlíer, I.M. testified on her son’s behalf. She stated that, although there was a time that her son and R.P.’s mother lived together in New Orleans, it was not in 2002 to 2004. She claimed that McClendon was living with her in Marrero, Louisiana during that period. I.M. also stated that she never saw McClendon touch B.M.l inappropriately, and that she has a rule in her house that no doors can be locked. McClendon took the stand in his own defense at trial. He testified, that he is forty-eight years old and is currently living with his mother and daughter, B.M.2, in Marrero, Louisiana. He denied all allegations of sexual abuse of R.P. and B.M.l. He testified he knew that B.M.l transmitted a nude photo, and that Texas authorities were considering bringing child pornography charges against B.M.1. McClendon stated that B.M.l continued to communicate with him after she made |inthe allegations in 2010 and asked him for money to pay for school, books, clothing and doctor visits. He said seeing R.P; and B.M.l cry on the. witness stand' was “hurtful” to him. McClendon testified, that both girls. were known to be liars and were lying about the allegations. He suggested that B.M.l made the allegations against him to avoid the charge of child pornography. McClendon also stated that no one from NOPD, the Orleans Parish District Attorney’s Office or the Jefferson Parish Police Department contacted him to get his side of the story. He noted that no police official testified at trial about the investigation of the abuse allegations and commented that no law enforcement official came to his home in Marrero to take pictures or talk to his other daughter or mother. ASSIGNMENT OF ERROR NUMBER ONE In his first assignment of error, McClen-don contends that there is insufficient evidence to support his conviction for molestation of a juvenile. Specifically, he argues there is reasonable doubt as to whether he engaged in the alleged behavior because R.P. provided conflicting and unreliable testimony. Additionally, defendant asserts the State presented insufficient evidence to show that he exercised control or supervision over R.P. When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence.[1] The standard for review of the sufficiency of evidence used- to convict a defendant of a crime is well-settled. In evaluating 11 whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a- reasonable doubt.[2] Defendant was convicted of the molestation of R.P. when she was between the ages of thirteen and fifteen. Molestation of a juvenile is defined by La. R.S. 14:81.2A.(1) as follows: Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person'or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile’s age shall not be a defense. The essential elements of the crime of molestation of a juvenile, each of which the prosecution must prove beyond a reasonable doubt, are that; (1) the accused was oyer the age of 17, (2) the accused committed a lewd or lascivious act upon the person or in the presence of a. child under the age of 17, (3) the accused was more than two years older than the victim, (4). the accused had the specific intent to arouse or gratify either , the child’s sexual desires or his or her own sexual desires, (5) and the accused committed the lewd or lascivious act by use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm or by the use of influence by virtue of a position of control or supervision over the juvenile.[3] McClendon does not dispute the age difference element of the crime. The victim was about thirteen and the defendant was about thirty-four when the abuse began. Further, the details of the incidents provide sufficient evidence of “lewd or lascivious acts” with the intent to arouse the child’s and/or the defendant’s sexual desires. For purposes of molestation of a juvenile, a “lewd or lascivious act” is one which tends to excite lust and to deprave morals with respect to sexual relations and which is obscene, indecent and related to sexual impurity or incontinence carried on in a wanton manner.[4] McClendon’s first argument as it relates to the sufficiency of evidence is that there was reasonable doubt as to whether he actually engaged in the alleged behavior because R.P. provided conflicting and unreliable testimony. This argument relies primarily on discrepancies in the timeline of the incidents related in R.P.’s testimony, and when exactly he supposedly exposed his penis. Additionally, McClen-don points to the fact that the three other children sleeping in the same room did not corroborate R.P.’s testimony that he came into the bedroom and molested her. McClendon argues R.P.’s testimony,' that he got into the top bunk with her and another child without waking the other children in the room, is incredible given the fact that he weighs over 250 pounds. He also notes that there is some discrepancy in the record regarding when R.P. decided to report her abuse. In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the court, is sufficient to support a conviction.[5] Credibility determinations are within the sound | ^discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence.[6] Although the timeline and order of the incidents of the molestation and the report of the molestation may have been confused in the victim’s mind and testimony, the fact that the abuse occurred on numerous occasions is not. The date and time of the offense of molestation of a juvenile are not essential elements of the offense.[7] Also, while it is true that none of the three siblings witnessed the abuse, the record shows that when the abuse occurred, they ranged in age from four to eight-years-old. A rational trier of fact could have concluded that the children did not witness the abuse because of their young age, and the fact that they were asleep when it happened. Furthermore, the veracity of R.P.’s testimony was supported by the videotaped statement of B.M.1 wherein she recounted her own molestation as it showed that McClendon employed similar methods of abuse in his behavior with her. He began the abuse by sitting both girls on his lap and fondling their breasts. Then, on subsequent occasions McClendon began touching and placing his fingers inside of their vaginas. The record also shows that McClendon started sexually abusing both girls when they reached adolescence and were living .or visiting in his household. In the alternative, McClendon argues the State presented insufficient evidence to show that he exercised control or supervision over R.P. McClendon asserts that, although R.P. stated she thought of him as a father figure, he is not her 114father, and there is no evidence that he was ever place in charge of R.P. by her mother, or that he was ever alone with her. McClendon argues there was conflicting testimony as to his actual place of residence. In support of this argument, McClendon cites State v. Mallette.[8] We find McClen-don’s reliance on Mallette to be misplaced. In Mallette there was no evidence that the defendant lived in the home with the victim, nor was there evidence'that the defendant acted as a father figure to the victim. The Mallette defendant was a truck driver who was on the road most of the time and there was no testimony to show he was ever alone with the victim. The facts in Mallette are clearly distinguishable from the instant case in which McClendon lived in the home, was there regularly, acted as a father figure to the victim, and was the biological father of the victim’s three half-siblings. We are mindful of the Louisiana Supreme Court’s recent pronouncement in State v. Graham[9], that the defendant’s status alone is insufficient to show control or supervision, and there must be evidence that the defendant exercised control or supervision over the juvenile to satisfy this element. However, unlike Graham, in the matter before us, the State did not rely solely on McClendon’s status as the mother’s boyfriend to satisfy this element of the crime. There was sufficient evidence to show an emotional bond between McClen-don and R.P. that was akin to a father-daughter relationship. Additionally, there is evidence to support a finding that McClendon used force, menace or intimidation in his molestation of R.P. She testified that she | ^pushed his hand away and kicked him to try to prevent the abuse. Given that McClendon.is a large man .who was about twenty .years older than the victim, the jury could have reasonably found sufficient evidence of this element of the crime; We find upon review of all of the evidence presented at trial that there is sufficient evidence to convict in this case. This assignment is without merit. ASSIGNMENT OF ERROR NUMBER TWO McClendon’s second and third assignments of error relate to the admission of B.M.l’s videotape. In this assignment, McClendon argues that the trial court erred when it allowed the abuse allegations of B.M.1 against him- by way of the videotape into evidence without a limiting instruction to the jury beforehand. Although the trial court did not give limiting instructions at the time the videotape was played for the jury, the trial court did give limiting instructions in the jury charge .as requested by the defense at the close of trial. In brief to this Court, McClendon argues that the limiting instructions given by the Court after closing argument were not süfficient- because the State’s opening arguments referred to B.M.l’s allegations; the State’s elicited testimony from Ms. Troy regarding her opinion on B.M.l’s behavior; the court failed to instruct the jury before the evidence of- B.M.l’s allegation was admitted; trial was recessed after the video without hearing fi’om R.P., the victim in this case; and the State consistently referred to B.M.l and R.P. as- the “victims in this case.” The'record shows that the State gave McClendon notice of its intent to introduce evidence related to B.M.l’s allegation at trial pursuant to La. C.E. art. |1n412.2[10]. After a pre-trial hearing, the trial court found the evidence admissible, and McClendon objected to that ruling. At trial the State introduced the video of B.M.l’s advocacy interview over a defense objection that the video' and the allegations it contained were not relevant, unfairly prejudicial and constituted hearsay. Additionally, McClendon argued the videotape deprived him of the opportunity to cross-examine his accuser. The State countered that the tape was admissible pursuant to La. Ch.C. art. 325 which provides that a “videotape authorized by this Chapter is hereby admissible in evidence as an exception to the hearsay rule.” Further, the State asserted that it provided the proper foundation for the admission of the videotape as required by Ch.C.art, 326,[11] and argued that the defendant’s confrontation rights were not- compromised because B.M.l was 117available to testify. After conducting a brief conference with the attorneys in chambers and speaking 1 with B.M.l, the trial court ruled the videotape admissible. La. C.E. art. 412.2A creates an exception in sex offense cases to the general prohibition of the introduction of other crimes, wrongs or acts for the purpose of proving a person’s character or propensity to criminal activity set forth in La. C.E. art. 404B(1), However, relevant evidence “may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice confusion of the issues, or misleading the jury, or by considerations of undue delay or waste of time.”[12] McClendon argues the trial court erred in allowing the videotape to be shown to the jury without explaining to the jury that the accusations in the videotape could not be used to convict him. McClendon points out that he was never arrested for any allegations of abuse of B.M.I. A trial court’s ruling on the admissibility of evidence is reviewed for an abuse of discretion.[13] This same standard is applied to rulings on the ádmission of other crimes evidence and evidence under La. C.E. art. 412.2.[14] Initially we note that it is not necessary, for purposes of La. C.E. 412.2 testimony, that the defendant be charged, prosecuted, or convicted of the “other acts” described.[15] ’ • hsln support of his argument that the trial court erred in failing to instruct the jury before playing the videotape, the defendant cites State v. Brown.[16] In Brown, the defendant stipulated that he pled guilty to a prior charge of attempted forcible rape outside the presence of the jury, but objected to the introduction of the factual basis of that guilty plea being read to the jury in his trial for attempted forcible rape of an eleven-year-old victim. He alleged he was convicted on the current charge based on his prior criminal history, not on the evidence or facts presented at trial. The Brown court found merit in defendant’s argument that the trial court erred when it refused to provide a limiting instruction as to the prior convictions. The Brown court reasoned that the enactment of article 412.2 did not abrogate La,C.E. art. 105 which provides that, “(w)hen evidence which is admissible as to one party or for o'ne purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly. Failure to restrict the evidence and instruct the jury shall not constitute error absent a request to do so.” The difference in the matter before us is that McClendon did not request a limiting instruction pursuant to article 105 either before or after the videotape was played to the jury. A request for such an instruction is mandated by La. C.E. article 105. Further, La.C.Cr.P. art. 841(A) provides that “(a)n irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence,” and requires that the party state the grounds for the objection. McClendon did not object to the lack of limiting instruction during the trial,' and [13thus did not preserve his right to appeal any prejudice stemming'from the trial court’s failure to instruct the jury before it heard B.M.l’s accusations.[17] McClendon did request a limiting jury instruction after the general charges were read, and the trial court charged the jury as requested; however, McClendon argues that was insufficient. McClendon also claims that in closing arguments the State rehashed B.M.l’s allegations and made various inappropriate remarks on rebuttal, including that the jury was “here because of the abuse and molestation [B.M.l] went through” in rebuttal arguments. McClen-don argues all these events, in the absence of a limiting instruction beforehand, were prejudicial, misleading, and caused juror confusion. However, McClendon failed to lodge an objection to the majority of the allegedly improper references and in the instances that he did object, the basis of the objection did not relate to inadmissibility of or prejudicial effect of B.M.l’s abuse allegations. As such, defendant may not avail himself of any of these alleged errors in that regard on appeal.[18] La. C.Cr.P. art. 801(C) provides that a party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error. Here, the trial court instructed the jury prior to deliberations that McClendon could not be convicted of any offense other than the charged offense and no objection was made to the trial court’s instruction. |gnBecause no objection was made to the jury instructions, any error in this regard was not properly preserved for appellate review.[19] Nevertheless, McClendon urges this Court to find the prejudicial effect of the admission of the video outweighs the probative value. In State v. Wright[20], the Louisiana Supreme Court noted that arti-ele 412.2, was enacted to loosen restrictions on other crimes evidence, and to allow evidence of lustful disposition in cases involving sexual offenses. In weighing the probative value versus the prejudicial effect of the other crimes evidence before it, the Wright court looked at the similarities between the other crimes evidence and the facts presently before it. Finding the similarities between the two acts “were sufficiently probative to support the admission” of the other crimes evidence, the Supreme Court noted that the “evidence demonstrates defendant had a propensity for sexual activity with adolescents where he held a position of authority, and where the adolescent children were in his household.”[21] Similarly, the evidence of B.M.l’s abuse was relevant to show that McClendon had a lustful disposition toward adolescent children with whom he shared a household and had a close paternal relationship. The record shows that R.P. and B.M.l were young teenagers and were living or staying with McClendon at the timé of the abuse. R.P. viewed McClendon as a father figure, and he is the father of B.M.I. The pattern of abuse was also similar. We find that the two crimes were sufficiently similar to support the trial court’s decision to admit the evidence. For the foregoing reasons, we find no merit in this assignment of error. ASSIGNMENT OF ERROR THREE In this assignment, McClendon claims that the trial court erred in allowing the videotape of B.M.1 into evidence or erred in denying a motion for mistrial when the prosecution played a videotape of B.M.l but did not call her to testify in its ease-in-chief in violation of his right to confrontation. Louisiana is one of several states that have established procedures to protect child victims of sexual abuse who testify at trial from unnecessary trauma.[22] Jurisprudence demands that these procedures be followed with exactitude.[23] Here, after the video of B.M.l’s interview was played in open court and the trial court excused the jury for lunch, defendant moved for mistrial based on hearsay. Outside of the jury’s presence, McClendon argued for a mistrial on the basis that there were no questions regarding medical treatment or purposes, the defense argued, was one of the reasons for allowing the evidence to be admitted. The State countered that the court’s rulings were largely based on hearsay objections and rested its argument ón the proposition that the video was admissible hearsay. The trial court denied the mistrial. The United States Constitution provides that “[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.”[24] The Louisiana Constitution similarly provides, “[a]n accused is entitled to confront and cross-examine the witnesses against him.”[25] McClendon argues that it was insufficient that the State made B.M.l “available” for the defense to call as a | ¡^witness. He claims that a defendant is entitled to cross-examine the witnesses against him and that he is deprived of that right when the accuser is not called in the State’s case-in-chief. McClendon also argues that forcing him to call an accuser to testify creates a risk of inflaming the jury against him and also unfairly requires him to choose between his right to cross-examine a complaining witness and his right to rely on the State’s burden of proof in a criminal case.[26] McClendon refers this Court to State ex rel. D.G.[27]. In our original opinion in that case we held that, the introduction into evidence of a videotapes interview of a child sexual abuse victim, where the victim did not testify, did not violate the defendant’s Sixth Amendment right to confront witnesses against him where the victim was available in the courthouse during the hearing. We found the victim was “available” for cross-examination by the juvenile defendant, noting that the case was tried before the bench and so there was no jury for the defendant to inflame had he chosen to call the victim to the stand. In doing so, we distinguished prior cases[28] concerned with the potentially inflammatory effect on the jury of having the defendant call the child victim to the stand by reasoning that the defendant in D.G. was tried before the bench, not before a jury. That decision was reversed by the United States Supreme Court[29], and remanded to this Court for further consideration. On remand we reaffirmed the defendant’s conviction, finding that the victim’s availability in court was sufficient and that it was not necessary for the prosecution to call him as a witness. The Louisiana Supreme I^Court denied writs [30], the United States Supreme Court has denied certioari[31] and the D.G; case is established law. We are not inclined to revisit that matter. - In the matter before us, the State announced, and the trial court acknowledged, that B.M.1 was available to testify. Counsel for defense did in fact subject B.M.l to questions at trial. When the declarant appears for cross-examination' at trial, the Confrontation Clause places no constraints at all-on the use of his prior testimonial statements.[32] Additionally, the Confrontation Clause guarantees only ‘an- opportunity - for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish.’[33] Additionally, at the -time of trial, B.M.1 was twenty-years-old and no longer a child. Therefore, the risk of inflaming a jury by the defendant calling a child-accuser- to the stand is not an issue. Accordingly, we find that, because B.M.1 was available for examination by the defense, McClendon’s right to confrontation was not violated. There is no merit in this assignment of error. ASSIGNMENT OF ERROR NUMBER FOUR As his fourth assignment of error, McClendon argues that the trial court failed to timely bring him to trial in violations of his statutory and constitutional rights. McClendon argues that the State erred by failing to timely commence trial within two years in accordance with La. C.Cr,P. art. 578, He also contends the State violated his right to a speedy trial guaranteed, by both the federal and state constitutions. U.S. Const. Amendment 6; La. Const. Art. I, § 16. McClendon [^argues that because the State took five years to bring him to trial, the delay is presumptively prejudicial triggering the consideration of the factors set forth in Barker v. Wingo.[34] However, McClendon failed to file a motion to quash seeking to challenge the untimely commencement of trial or to assert a violation of his constitutional right to a speedy trial. A motipn to quash is the proper procedural vehicle for raising untimely prosecution.[35] A defendant may also raise a claim for the denial of his constitutional right to a speedy trial by a-motion to quash.[36] Further, McClendon did not file a motion for speedy trial. Because he did not raise these claims before the trial court,1 McClendon failed to preserve for appeal any alleged violation of his right to speedy trial or claim of untimely prosecution.[37] . Accordingly, we find no merit in this assignment. ASSIGNMENT OF ERROR NUMBER FIVE As his fifth assignment of error, McClendon argues that the trial court erred in allowing Ms. Holcomb to testify as to B.M.l’s statements as such testimony constitutes hearsay. A defendant cannot avail himself of an alleged error unless he made a contemporaneous, objection at the time of the error.[38] Not only does an objection have to be made, but La.C.Cr.P. art. 841(A) requires that a defendant \ 2Smake known the grounds for his objection, and he is limited on appeal to those grounds articulated at trial.[39] Ms. Holcomb conducted the interview of B.M.1, and her testimony provided the foundation for the introduction of the videotape of B.M.1 into evidence. As discussed above, McClendon objected to admission of the videotape and raised multiple arguments as to why the -video should be excluded,’ including hearsay grounds. However, McClendon did not argue that Ms. Holcomb should not be permitted to testify nor did he object to the content of Ms. Holcomb’s testimony or to her qualifications. Even if the hearsay objection made to the videotape can be construed to include Ms. Holcomb’s testimony, there is no merit in defendant’s argument. Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted.[40] The-State’did not introduce Ms. Holcomb’s testimony to establish that B.M.1 was sexually abused by défendant. B.M.1 did that herself in the videotape. Ms. Holcomb conducted the interview of B.M.1, and her testimony provided the foundation for the introduction of-the videotape of B.M.1 into evidence. Ms. Holcomb testified that she made no credibility determinations, she simply conducted a forensic interview that was videotaped. Her testimony. was not offered to prove the truth of the matter asserted. This assignment of error is without merit. • I ASSIGNMENT OF ERROR NUMBER SIX As his final assignment of error, McClendon argues that the trial court erred when it failed to maintain a complete record of the proceedings. Here, the record does not contain a transcript of the hearing on' preliminary examination held on July * 16, 2012. M’cClendon argues that because there is no transcript from the preliminary hearing, he is prohibited from, evaluating the consistency, of .R.P.’s allegations against him. Defendant notes that the preliminary hearing occurred four years before trial and that the State did not interview R.P. until October of 2015. McClendon also argues the record'. shows an -objection was made by the defense and without the transcript this Court is unable to review the objection. The Louisiana Supreme Court has previously held that where minute entries show relatively minor events, or where there are “gaps” in the record, such inconsequential omissions merit no relief.[41] While the transcript of the preliminary examination is not in the record, the minute entry and arrest warrant are. The minute entry indicates that no witnesses testified and that the matter was submitted to the trial court on the arrest warrant alone.[42] In light of the evidence against McClendon, we do not find the missing preliminary hearing transcript amounts to a material omission that would bear on the merits and require a reversal. This assignment is meritless. |27Finally, we have reviewed the record for errors patent in accordance with La. C.Cr.P. art. 920 and have found no such errors. For reasons set forth herein, we affirm the conviction and remand the matter to the trial court for a determination of McClendon’s motion to reconsider sentence. We reserve defendant’s right to appeal his sentence after a ruling on that motion is made in the trial court. CONVICTION AFFIRMED; MATTER REMANDED WITH INSTRUCTIONS . State v. Campbell, 2015-0017 (La.App. 4 Cir. 6/24/15), 171 So.3d 1176, writ denied, 2012-0550 (La. 4/20/12), 85 So.3d 1273. . Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). .State v. Leblanc, 506 So.2d 1197, 1199 (La. 1987). . State v. Terry, 47,425, pp. 25-26 (La.App. 2 Cir. 11/21/12), 108 So.3d 126, 143, writ denied, 12-2759 (La. 6/28/13), 118 So.3d 1096. . State v. Jones, 97-2591, p.6 (La.App. 4 Cir. 9/8/99), 744 So.2d 165, 169, writ denied, 99-3141 (La. 4/7/00), 759 So.2d 91. . State v. Vessell, 450 So.2d 938, 943 (La. 1984). . State v. Dale, 50,195, p.7 (La.App. 2 Cir. 11/18/15), 180 So.3d 528, 534, writ denied, 2015-2291 (La. 4/4/16), 190 So.3d 1203. . 15-1131 (La. App. 3 Cir. 6/8/16), 193 So.3d 603, writ denied, 2016-1301 (La. 6/17/17), 221 So.3d 837. . 2014-1801, pp. 7-8 (La. 10/14/15), 180 So.3d 271, 276-277. . A. When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the' accused’s commission of another crime, wrong, or act involving sexually as-saultive behavior or - acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403. B. In a case in which the state intends to offer evidence under the. provisions of this Article, the prosecution shall, upon request of the accused, provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes. C. This Article shall not be construed to limit the admission or consideration of evidence under any other rule. . A. A videotape of the statements of a protected person who is alleged to'be the victim of or witness to a crime may be offered in ■ evidence for or against such crime. To render such a videotape competent evidence, all of the following must be satisfactorily proved: (1) Such electronic recording was voluntarily made by the protected person. (2) No relative of the protected person was present in the room in which the recording was made. (3) No attorney for either party was present when the statement was made. (4) Such recording was not made of answers to questions calculated to lead the protected person to make any particular statement, (5) Such recording is both visual and oral and is recorded on film or videotape or by other eléctronic means. (6) Such recording is accurate, has not been ■altered, and- reflects what the protected .person said. .(7) The taking of the protected person's statement was supervised by a physician, a social worker, a law enforcement officer, a licensed psychologist, medical psyfchologist, licensed professional counselor, or an authorized representative of the department. (8) Every voice on the recording is identified. B. The department shall develop and promulgate regulations regarding training requirements and certification for department personnel who are authorized to supervise the taking of the protected person’s statement. . La. C.E. 403. . State v. Cosey, 97-2020, p.13 (La. 11/28/00), 779 So.2d 675, 684. . State v. Wright, 2011-0141, p.8 (La. 12/6/11), 79 So.3d 309, 316. . State v. Dale, 50,195, p.11 (La.App. 2 Cir. 11/18/15), 180 So.3d 528, 536, writ denied, 15-2291 (La. 4/4/16), 190 So.3d 1203. . 03-1747 (La. App. 3 Cir. 5/12/04), 874 So.2d 318, writ denied, 2004-1413 (La. 11/08/04), 885 So.2d 1118. . See State v. Patterson, 05-560, p.15-16 (La. App. 5 Cir. 1/31/06), 922 So.2d 1195, 1204-1205, writ denied, 2006-1191 (La. 3/16/07), 952 So.2d 687. . La. C.Cr.P. art. 841(A). . State v. Nguyen, 04-321, p. 16 (La. App. 5 Cir. 9/28/04), 888 So.2d 900, 910, writ denied, 2005-0220 (La. 4/29/05), 901 So.2d 1064. . 2011-141, pp. 12-13 (La. 12/6/11), 79 So.3d 309, 317. . Wright, 2011-141, p. 14 (La. 12/6/11), 79 So.3d 309, 317-318. . See, La. R.S. 15:440.1, et seq.; La. R.S. 15:283; La. Ch. C. arts. 322 to 329. . State v. Carper, 45,178, p. 20 (La. App. 2 Cir. 6/9/10), 41 So.3d 605, 616. . State v. Hawkins, 2011-0193, p. 10 (La. App. 4 Cir. 11/16/11), 78 So.3d 293, 299 (citing U.S.C.A. Const. amend. 6). . Id. (citing La. Const. Art. 1 Section 16). . See, Lowery v. Collins, 988 F.2d 1364 (5th Cir. 1993). . 2008-0938 (La. App. 4 Cir. 4/30/09), 11 So.3d 548, writ denied, 2009-1086 (La. 6/5/09), 9 So.3d 877, cert. granted, judgment vacated, D.G. v. Louisiana, 559 U.S. 967, 130 S.Ct. 1729, 176 L.Ed.2d 176 (2010). . See, Lowery, supra, and Offor v. Scott, 72 F.3d 30 (5th Cir. 1995). . D.G. v. Louisiana, 559 U.S. 967, 130 S.Ct. 1729, 176 L.Ed.2d 176 (2010). . State ex rel. D.G., 2008-0938 (La. App. 4 Cir. 5/27/10), 40 So.3d 409, writ denied, 2010-1423 (La. 9/3/10), 44 So.3d 707. . D.G. v. Louisiana, 563 U.S. 909, 131 S.Ct. 1795, 179 L,Ed.2d 664 (2011). . Crawford v. Washington, 541 U.S, 36, 59, 124 S.Ct. 1354, 1369, 158 L.Ed.2d 177 (2004). . United States v. Owens, 484 U.S, 554, 561, 108 S.Ct. 838, 842, 98 L.Ed.2d 951 (1988). . 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). . State v. Mattox, 96-1406, p. 3 (La. App. 4 Cir. 12/10/97), 704 So.2d 380, 382, writ denied, 98-1701 (La. 8/28/98), 723 So.2d 419. . State v. Stewart, 2007-850, p. 4 (La. App. 4 Cir. 4/9/08), 983 So.2d 166, 169, writ denied, 2011-1718 (La. 5/18/12), 89 So.3d 1180. . See, State v. Smith, 03-786, p. 15 (La. App. 5 Cir. 12/30/03), 864 So.2d 811, 823, writ denied, 2004-0380 (La. 6/25/04), 876 So.2d 830. . La.C.Cr.P. art. 841(A). . State v. Brooks, 98-0693, p. 9 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 819, writ denied, 1999-2519 (La. 2/25/00), 755 So.2d 247. . La. C.E. Art. 801(C). . State v. Draughn, 2005-1825, pp. 66, 950 So.2d 583, 627 (citing State v. LaCaze, 1999-0584, p. 17 (La. 1/25/02), 824 So.2d 1063, 1076-1077), cert denied, Draughn v. Louisiana, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). . Arguably, no transcript exists of the preliminary hearing because no witnesses took the stand.